# MINCEY *v.* ARIZONA

No. 77–5353.   Argued February 21, 1978—Decided June 21, 1978

386

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined, and in Part I of which REHNQUIST, J., joined. MARSHALL, J.,

filed a concurring opinion, in which BRENNAN, J., joined, *post*, p. 402. REHNQUIST, J., filed an opinion concurring in part and dissenting in part, *post*, p. 405.

*Richard Oseran* argued the cause for petitioner. With him on the brief was *Frederick S. Klein.*

*Galen H. Wilkes,* Assistant Attorney General of Arizona, argued the cause for respondent. With him on the brief were *Bruce E. Babbitt,* Attorney General, *Philip G. Urry,* Assistant Attorney General, and *William J. Schafer III.*

MR. JUSTICE STEWART delivered the opinion of the Court.

On the afternoon of October 28, 1974, undercover police officer Barry Headricks of the Metropolitan Area Narcotics Squad knocked on the door of an apartment in Tucson, Ariz., occupied by the petitioner, Rufus Mincey. Earlier in the day, Officer Headricks had allegedly arranged to purchase a quantity of heroin from Mincey and had left, ostensibly to obtain money. On his return he was accompanied by nine other plainclothes policemen and a deputy county attorney. The door was opened by John Hodgman, one of three acquaintances of Mincey who were in the living room of the apartment. Officer Headricks slipped inside and moved quickly into the bedroom. Hodgman attempted to slam the door in order to keep the other officers from entering, but was pushed back against the wall. As the police entered the apartment, a rapid volley of shots was heard from the bedroom. Officer Headricks emerged and collapsed on the floor. When other officers entered the bedroom they found Mincey lying on the floor, wounded and semiconscious. Officer Headricks died a few hours later in the hospital.

The petitioner was indicted for murder, assault,[1] and three

---

[1] The assault charge was based on the wounding of a person in the living room who was hit by a bullet that came through the wall.

counts of narcotics offenses. He was tried at a single trial and convicted on all the charges. At his trial and on appeal, he contended that evidence used against him had been unlawfully seized from his apartment without a warrant and that statements used to impeach his credibility were inadmissible because they had not been made voluntarily. The Arizona Supreme Court reversed the murder and assault convictions on state-law grounds,[2] but affirmed the narcotics convictions. 115 Ariz. 472, 566 P. 2d 273. It held that the warrantless search of a homicide scene is permissible under the Fourth and Fourteenth Amendments and that Mincey's statements were voluntary. We granted certiorari to consider these substantial constitutional questions. 434 U. S. 902.

I

The first question presented is whether the search of Mincey's apartment was constitutionally permissible. After the shooting, the narcotics agents, thinking that other persons in the apartment might have been injured, looked about quickly for other victims. They found a young woman wounded in the bedroom closet and Mincey apparently unconscious in the bedroom, as well as Mincey's three acquaintances (one of whom had been wounded in the head) in the living room. Emergency assistance was requested, and some medical aid was administered to Officer Headricks. But the agents refrained from further investigation, pursuant to a Tucson Police Department directive that police officers should not investigate incidents in which they are involved. They neither searched further nor seized any evidence; they merely guarded the suspects and the premises.

Within 10 minutes, however, homicide detectives who had

---

[2] The state appellate court held that the jury had been improperly instructed on criminal intent. It appears from the record in this case that the retrial of the petitioner on the murder and assault charges was stayed by the trial court after certiorari was granted by this Court.

heard a radio report of the shooting arrived and took charge of the investigation. They supervised the removal of Officer Headricks and the suspects, trying to make sure that the scene was disturbed as little as possible, and then proceeded to gather evidence. Their search lasted four days,[3] during which period the entire apartment was searched, photographed, and diagrammed. The officers opened drawers, closets, and cupboards, and inspected their contents; they emptied clothing pockets; they dug bullet fragments out of the walls and floors; they pulled up sections of the carpet and removed them for examination. Every item in the apartment was closely examined and inventoried, and 200 to 300 objects were seized. In short, Mincey's apartment was subjected to an exhaustive and intrusive search. No warrant was ever obtained.

The petitioner's pretrial motion to suppress the fruits of this search was denied after a hearing. Much of the evidence introduced against him at trial (including photographs and diagrams, bullets and shell casings, guns, narcotics, and narcotics paraphernalia) was the product of the four-day search of his apartment. On appeal, the Arizona Supreme Court reaffirmed previous decisions in which it had held that the warrantless search of the scene of a homicide is constitutionally permissible.[4] It stated its ruling as follows:

> "We hold a reasonable, warrantless search of the scene of a homicide—or of a serious personal injury with likelihood of death where there is reason to suspect foul play—

---

[3] The police also returned to the apartment in November 1974, at the request of the petitioner's landlord, to remove property of the petitioner that remained in the apartment after his lease had expired on October 31.

[4] *State* v. *Sample,* 107 Ariz. 407, 489 P. 2d 44; *State ex rel. Berger* v. *Superior Court,* 110 Ariz. 281, 517 P. 2d 1277; *State* v. *Duke,* 110 Ariz. 320, 518 P. 2d 570. The Court of Appeals for the Ninth Circuit reversed the denial of a petition for a writ of habeas corpus filed by the defendant whose conviction was upheld in *State* v. *Sample, supra,* on the ground, *inter alia,* that the warrantless search of the homicide scene violated the Fourth and Fourteenth Amendments. *Sample* v. *Eyman,* 469 F. 2d 819.

does not violate the Fourth Amendment to the United States Constitution where the law enforcement officers were legally on the premises in the first instance. . . . For the search to be reasonable, the purpose must be limited to determining the circumstances of death and the scope must not exceed that purpose. The search must also begin within a reasonable period following the time when the officials first learn of the murder (or potential murder)." 115 Ariz., at 482, 566 P. 2d, at 283.

Since the investigating homicide detectives knew that Officer Headricks was seriously injured, began the search promptly upon their arrival at the apartment, and searched only for evidence either establishing the circumstances of death or "relevant to motive and intent or knowledge (narcotics, e. g.)," *id.,* at 483, 566 P. 2d, at 284, the court found that the warrantless search of the petitioner's apartment had not violated the Fourth and Fourteenth Amendments.

We cannot agree. The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz* v. *United States,* 389 U. S. 347, 357 (footnotes omitted); see also *South Dakota* v. *Opperman,* 428 U. S. 364, 381 (POWELL, J., concurring); *Coolidge* v. *New Hampshire,* 403 U. S. 443, 481; *Vale* v. *Louisiana,* 399 U. S. 30, 34; *Terry* v. *Ohio,* 392 U. S. 1, 20; *Trupiano* v. *United States,* 334 U. S. 699, 705. The Arizona Supreme Court did not hold that the search of the petitioner's apartment fell within any of the exceptions to the warrant requirement previously recognized by this Court, but rather that the search of a homicide scene should be recognized as an additional exception.

Several reasons are advanced by the State to meet its "bur-

den . . . to show the existence of such an exceptional situation" as to justify creating a new exception to the warrant requirement. See *Vale* v. *Louisiana, supra,* at 34; *United States* v. *Jeffers,* 342 U. S. 48, 51. None of these reasons, however, persuades us of the validity of the generic exception delineated by the Arizona Supreme Court.

The first contention is that the search of the petitioner's apartment did not invade any constitutionally protected right of privacy. See *Katz* v. *United States, supra.* This argument appears to have two prongs. On the one hand, the State urges that by shooting Officer Headricks, Mincey forfeited any reasonable expectation of privacy in his apartment. We have recently rejected a similar waiver argument in *Michigan* v. *Tyler,* 436 U. S. 499, 505–506; it suffices here to say that this reasoning would impermissibly convict the suspect even before the evidence against him was gathered.[5] On the other hand, the State contends that the police entry to arrest Mincey was so great an invasion of his privacy that the additional intrusion caused by the search was constitutionally irrelevant. But this claim is hardly tenable in light of the extensive nature of this search. It is one thing to say that one who is legally taken into police custody has a lessened right of privacy in his person. See *United States* v. *Edwards,* 415 U. S. 800, 808–809; *United States* v. *Robinson,* 414 U. S. 218. It is quite another to argue that he also has a lessened right of privacy in his entire house. Indeed this very argument was rejected when it was advanced to support the warrantless search of a dwelling where a search occurred as "incident" to the arrest of its occupant. *Chimel* v. *California,* 395 U. S. 752, 766 n. 12.

---

[5] Moreover, this rationale would be inapplicable if a homicide occurred at the home of the victim or of a stranger, yet the Arizona cases indicate that a warrantless search in such a case would also be permissible under the "murder scene exception." Cf. *State* v. *Sample, supra,* at 409, 489 P. 2d, at 46.

Thus, this search cannot be justified on the ground that no constitutionally protected right of privacy was invaded.

The State's second argument in support of its categorical exception to the warrant requirement is that a possible homicide presents an emergency situation demanding immediate action. We do not question the right of the police to respond to emergency situations. Numerous state [6] and federal [7] cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. Cf. *Michigan* v. *Tyler, supra,* at 509–510. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Wayne* v.

[6] *E. g., People* v. *Hill,* 12 Cal. 3d 731, 753–757, 528 P. 2d 1, 18–21; *Patrick* v. *State,* 227 A. 2d 486, 488–490 (Del.); *People* v. *Brooks,* 7 Ill. App. 3d 767, 775–777, 289 N. E. 2d 207, 212–214; *Maxey* v. *State,* 251 Ind. 645, 649–650, 244 N. E. 2d 650, 653–654; *Davis* v. *State,* 236 Md. 389, 395–397, 204 A. 2d 76, 80–82; *State* v. *Hardin,* 90 Nev. 10, 518 P. 2d 151; *State* v. *Gosser,* 50 N. J. 438, 446–448, 236 A. 2d 377, 381–382; *People* v. *Mitchell,* 39 N. Y. 2d 173, 347 N. E. 2d 607; *State* v. *Pires,* 55 Wis. 2d 597, 603–605, 201 N. W. 2d 153, 156–158. Other cases are collected in Note, The Emergency Doctrine, Civil Search and Seizure, and the Fourth Amendment, 43 Ford. L. Rev. 571, 584 n. 102 (1975). See also ALI Model Code of Pre-Arraignment Procedure § SS 260.5 (Prop. Off. Draft 1975). By citing these cases and those in the note following, of course, we do not mean to approve the specific holding of each case.

[7] *E. g., Root* v. *Gauper,* 438 F. 2d 361, 364–365 (CA8); *United States* v. *Barone,* 330 F. 2d 543 (CA2); *Wayne* v. *United States,* 115 U. S. App. D. C. 234, 238–243, 318 F. 2d 205, 209–214 (opinion of Burger, J.); *United States* v. *James,* 408 F. Supp. 527, 533 (SD Miss.); *United States ex rel. Parson* v. *Anderson,* 354 F. Supp. 1060, 1086–1087 (Del.), aff'd, 481 F. 2d 94 (CA3); see *Warden* v. *Hayden,* 387 U. S. 294, 298–299; *McDonald* v. *United States,* 335 U. S. 451, 454–456; *Johnson* v. *United States,* 333 U. S. 10, 14–15.

*United States,* 115 U. S. App. D. C. 234, 241, 318 F. 2d 205, 212 (opinion of Burger, J.). And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. *Michigan* v. *Tyler, supra,* at 509–510; *Coolidge* v. *New Hampshire,* 403 U. S., at 465–466.

But a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation," *Terry* v. *Ohio,* 392 U. S., at 25–26, and it simply cannot be contended that this search was justified by any emergency threatening life or limb. All the persons in Mincey's apartment had been located before the investigating homicide officers arrived there and began their search. And a four-day search that included opening dresser drawers and ripping up carpets can hardly be rationalized in terms of the legitimate concerns that justify an emergency search.

Third, the State points to the vital public interest in the prompt investigation of the extremely serious crime of murder. No one can doubt the importance of this goal. But the public interest in the investigation of other serious crimes is comparable. If the warrantless search of a homicide scene is reasonable, why not the warrantless search of the scene of a rape, a robbery, or a burglary? "No consideration relevant to the Fourth Amendment suggests any point of rational limitation" of such a doctrine. *Chimel* v. *California, supra,* at 766.

Moreover, the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment. Cf. *Coolidge* v. *New Hampshire, supra,* at 481. The investigation of crime would always be simplified if warrants were unnecessary. But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law. See *United States* v. *Chadwick,* 433 U. S. 1, 6–11. For this reason, warrants are

generally required to search a person's home or his person unless "the exigencies of the situation" make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment. *McDonald* v. *United States,* 335 U. S. 451, 456; *Johnson* v. *United States,* 333 U. S. 10, 14–15. See, *e. g., Chimel* v. *California, supra* (search of arrested suspect and area within his control for weapons or evidence); *Warden* v. *Hayden,* 387 U. S. 294, 298–300 ("hot pursuit" of fleeing suspect); *Schmerber* v. *California,* 384 U. S. 757, 770–771 (imminent destruction of evidence); see also *supra,* at 392–393.

Except for the fact that the offense under investigation was a homicide, there were no exigent circumstances in this case, as, indeed, the Arizona Supreme Court recognized. 115 Ariz., at 482, 566 P. 2d, at 283. There was no indication that evidence would be lost, destroyed, or removed during the time required to obtain a search warrant. Indeed, the police guard at the apartment minimized that possibility. And there is no suggestion that a search warrant could not easily and conveniently have been obtained. We decline to hold that the seriousness of the offense under investigation itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search.

Finally, the State argues that the "murder scene exception" is constitutionally permissible because it is narrowly confined by the guidelines set forth in the decision of the Arizona Supreme Court, see *supra,* at 389–390.[8] In light of the extensive search that took place in this case it may be questioned what protection the guidelines afford a person in whose home a homicide or assault occurs. Indeed, these so-called guidelines

---

[8] The State also relies on the fact that observance of these guidelines can be enforced by a motion to suppress evidence. But the Fourth Amendment "is designed to prevent, not simply to redress, unlawful police action." *Chimel* v. *California,* 395 U. S. 752, 766 n. 12.

are hardly so rigidly confining as the State seems to assert. They confer unbridled discretion upon the individual officer to interpret such terms as "reasonable . . . search," "serious personal injury with likelihood of death where there is reason to suspect foul play," and "reasonable period." It is precisely this kind of judgmental assessment of the reasonableness and scope of a proposed search that the Fourth Amendment requires be made by a neutral and objective magistrate, not a police officer. See, *e. g., United States* v. *United States District Court,* 407 U. S. 297, 316; *Coolidge* v. *New Hampshire, supra,* at 449–453; *Mancusi* v. *DeForte,* 392 U. S. 364, 371; *Wong Sun* v. *United States,* 371 U. S. 471, 481–482.

It may well be that the circumstances described by the Arizona Supreme Court would usually be constitutionally sufficient to warrant a search of substantial scope. But the Fourth Amendment requires that this judgment in each case be made in the first instance by a neutral magistrate.

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States, supra,* at 13–14.

In sum, we hold that the "murder scene exception" created by the Arizona Supreme Court is inconsistent with the Fourth and Fourteenth Amendments—that the warrantless search of Mincey's apartment was not constitutionally permissible simply because a homicide had recently occurred there.[9]

---

[9] To what extent, if any, the evidence found in Mincey's apartment was permissibly seized under established Fourth Amendment standards will be for the Arizona courts to resolve on remand.

## II

Since there will presumably be a new trial in this case,[10] it is appropriate to consider also the petitioner's contention that statements he made from a hospital bed were involuntary, and therefore could not constitutionally be used against him at his trial.

Mincey was brought to the hospital after the shooting and taken immediately to the emergency room where he was examined and treated. He had sustained a wound in his hip, resulting in damage to the sciatic nerve and partial paralysis of his right leg. Tubes were inserted into his throat to help him breathe, and through his nose into his stomach to keep him from vomiting; a catheter was inserted into his bladder. He received various drugs, and a device was attached to his arm so that he could be fed intravenously. He was then taken to the intensive care unit.

At about eight o'clock that evening, Detective Hust of the Tucson Police Department came to the intensive care unit to interrogate him. Mincey was unable to talk because of the tube in his mouth, and so he responded to Detective Hust's questions by writing answers on pieces of paper provided by the hospital.[11] Hust told Mincey he was under arrest for the murder of a police officer, gave him the warnings required by *Miranda* v. *Arizona*, 384 U. S. 436, and began to ask questions about the events that had taken place in Mincey's apartment a few hours earlier. Although Mincey asked repeatedly that the interrogation stop until he could get a lawyer, Hust continued to question him until almost midnight.

---

[10] See also n. 2, *supra*.

[11] Because of the way in which the interrogation was conducted, the only contemporaneous record consisted of Mincey's written answers. Hust testified that the next day he went over this document and made a few notes to help him reconstruct the conversation. In a written report dated about a week later, Hust transcribed Mincey's answers and added the questions he believed he had asked. It was this written report that was used to cross-examine Mincey at his subsequent trial.

After a pretrial hearing, see *Jackson* v. *Denno,* 378 U. S. 368, the trial court found that Mincey had responded to this interrogation voluntarily.[12]   When Mincey took the witness stand at his trial his statements in response to Detective Hust's questions were used in an effort to impeach his testimony in several respects.[13]   On appeal, the Arizona Supreme Court indicated its belief that because Detective Hust had failed to honor Mincey's request for a lawyer, the statements would have been inadmissible as part of the prosecution's case in chief.  *Miranda* v. *Arizona, supra.*   But, relying on *Harris* v. *New York,* 401 U. S. 222, and *Oregon* v. *Hass,* 420 U. S. 714, it held that since the trial court's finding of voluntariness was not "clear[ly] and manifest[ly]" erroneous the statements were properly used for purposes of impeachment.   115 Ariz., at 480, 566 P. 2d, at 281.

Statements made by a defendant in circumstances violating the strictures of *Miranda* v. *Arizona, supra,* are admissible for

---

[12] The trial court made no findings of fact, nor did it make a specific finding of voluntariness, and the petitioner contends that admission of the statements therefore violated *Jackson* v. *Denno.*  We agree with the Arizona Supreme Court, however, that the finding of voluntariness "appear[s] from the record with unmistakable clarity."  *Sims* v. *Georgia,* 385 U. S. 538, 544.  The petitioner had originally moved to suppress his written answers to Hust's questions on two grounds: that they had been elicited in violation of *Miranda* v. *Arizona,* 384 U. S. 436, and that they had been involuntary.  During the hearing, the prosecution stipulated that the answers would be used only to impeach the petitioner if he took the witness stand.  Any violation of *Miranda* thus became irrelevant.  *Oregon* v. *Hass,* 420 U. S. 714; *Harris* v. *New York,* 401 U. S. 222.  The testimony and the briefs and arguments of counsel were thereafter directed solely to whether the answers had been voluntarily given, and the court specifically ruled that they would be admissible for impeachment purposes only.  The court thus necessarily held that Mincey's responses to Hust's interrogation were voluntary.

[13] In light of our holding that Mincey's hospital statements were not voluntarily given, it is unnecessary to reach his alternative contention that their use against him was impermissible because they were not sufficiently inconsistent with his trial testimony.

impeachment if their "trustworthiness . . . satisfies legal standards." *Harris* v. *New York, supra,* at 224; *Oregon* v. *Hass, supra,* at 722. But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law "even though there is ample evidence aside from the confession to support the conviction." *Jackson* v. *Denno, supra,* at 376; *Haynes* v. *Washington,* 373 U. S. 503, 518; *Lynumn* v. *Illinois,* 372 U. S. 528, 537; *Stroble* v. *California,* 343 U. S. 181, 190; see *Chapman* v. *California,* 386 U. S. 18, 23 and n. 8. If, therefore, Mincey's statements to Detective Hust were not " 'the product of a rational intellect and a free will,' " *Townsend* v. *Sain,* 372 U. S. 293, 307, quoting *Blackburn* v. *Alabama,* 361 U. S. 199, 208, his conviction cannot stand. In making this critical determination, we are not bound by the Arizona Supreme Court's holding that the statements were voluntary. Instead, this Court is under a duty to make an independent evaluation of the record. *Davis* v. *North Carolina,* 384 U. S. 737, 741–742; *Haynes* v. *Washington, supra,* at 515–516.

It is hard to imagine a situation less conducive to the exercise of "a rational intellect and a free will" than Mincey's. He had been seriously wounded just a few hours earlier, and had arrived at the hospital "depressed almost to the point of coma," according to his attending physician. Although he had received some treatment, his condition at the time of Hust's interrogation was still sufficiently serious that he was in the intensive care unit.[14] He complained to Hust that the pain in his leg was "unbearable." He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some

---

[14] A nurse testified at the suppression hearing that the device used to aid Mincey's respiration was reserved for "more critical" patients. Moreover, Mincey apparently remained hospitalized for almost a month after the shooting. According to docket entries in the trial court his arraignment was postponed several times because he was still in the hospital; he was not arraigned until November 26, 1974.

of his written answers were on their face not entirely coherent.[15] Finally, while Mincey was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus. He was, in short, "at the complete mercy" of Detective Hust, unable to escape or resist the thrust of Hust's interrogation. Cf. *Beecher* v. *Alabama,* 389 U. S. 35, 38.

In this debilitated and helpless condition, Mincey clearly expressed his wish not to be interrogated. As soon as Hust's questions turned to the details of the afternoon's events, Mincey wrote: "This is all I can say without a lawyer." Hust nonetheless continued to question him, and a nurse who was present suggested it would be best if Mincey answered. Mincey gave unresponsive or uninformative answers to several more questions, and then said again that he did not want to talk without a lawyer. Hust ignored that request and another made immediately thereafter.[16] Indeed, throughout the in-

---

[15] For example, two of the answers written by Mincey were: "Do you me Did he give me some money (no)" and "Every body know Every body." And Mincey apparently believed he was being questioned by several different policemen, not Hust alone; although it was Hust who told Mincey he had killed a policeman, later in the interrogation Mincey indicated he thought it was someone else.

[16] In his reconstruction of the interrogation, see n. 11, *supra,* Hust stated that, after he asked Mincey some questions to try to identify one of the other victims, the following ensued:

"HUST: . . . What do you remember that happened?

"MINCEY: I remember somebody standing over me saying 'move nigger, move.' I was on the floor beside the bed.

"HUST: Do you remember shooting anyone or firing a gun?

"MINCEY: *This is all I can say without a lawyer*.

"HUST: If you want a lawyer now, I cannot talk to you any longer, however, you don't have to answer any questions if you don't want to. Do you still want to talk to me?

"MINCEY: (Shook his head in an affirmative manner.)

"HUST: What else can you remember?

"MINCEY: I'm going to have to put my head together. There are so

terrogation Mincey vainly asked Hust to desist.  Moreover, he complained several times that he was confused or unable to think clearly, or that he could answer more accurately

many things that I don't remember I.  Like how did they get into the apartment?

"HUST:  How did who get into the apartment?

"MINCEY:  Police.

"HUST:  Did you sell some narcotics to the guy that was shot?

"MINCEY:  Do you mean, did he give me some money?

"HUST:  Yes.

"MINCEY:  No.

"HUST:  Did you give him a sample?

"MINCEY:  What do you call a sample?

"HUST:  A small amount of drug or narcotic to test?

"MINCEY: *I can't say without a lawyer.*

"HUST:  Did anyone say police or narcs when they came into the apartment?

"MINCEY:  Let me get myself together first.  You see, I'm not for sure everything happened so fast.  I can't answer at this time because I don't think so, but I can't say for sure.  Some questions aren't clear to me at the present time.

"HUST:  Did you shoot anyone?

"MINCEY: *I can't say, I have to see a lawyer.*"  (Emphasis supplied.)

While some of Mincey's answers seem relatively responsive to the questions, it must be remembered that Hust added the questions at a later date, with the answers in front of him.  See n. 11, *supra*.  The reliability of Hust's report is uncertain.  For example, Hust claimed that immediately after Mincey first expressed a desire to remain silent, Hust said Mincey need not answer any questions but Mincey responded by indicating that he wanted to continue.  There is no contemporaneous record supporting Hust's statement that Mincey acted so inconsistently immediately after asserting his wish not to respond further, nor did the nurse who was present during the interrogation corroborate Hust.  The Arizona Supreme Court apparently disbelieved Hust in this respect, since it stated that "after *each* indication from [Mincey] that he wanted to consult an attorney or that he wanted to stop answering questions, the police officer continued to question [him]."  115 Ariz., at 479, 566 P. 2d, at 280 (emphasis supplied).

the next day.[17] But despite Mincey's entreaties to be let alone, Hust ceased the interrogation only during intervals when Mincey lost consciousness or received medical treatment, and after each such interruption returned relentlessly to his task. The statements at issue were thus the result of virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness.

There were not present in this case some of the gross abuses that have led the Court in other cases to find confessions involuntary, such as beatings, see *Brown* v. *Mississippi,* 297 U. S. 278, or "truth serums," see *Townsend* v. *Sain,* 372 U. S. 293. But "the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn* v. *Alabama,* 361 U. S., at 206. Determination of whether a statement is involuntary "requires more than a mere color-matching of cases." *Reck* v. *Pate,* 367 U. S. 433, 442. It requires careful evaluation of all the circumstances of the interrogation.[18]

It is apparent from the record in this case that Mincey's statements were not "the product of his free and rational choice." *Greenwald* v. *Wisconsin,* 390 U. S. 519, 521. To the contrary, the undisputed evidence makes clear that Mincey wanted *not* to answer Detective Hust. But Mincey was weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious, and his will was simply

---

[17] In addition to the statements quoted in n. 16, *supra,* Mincey wrote at various times during the interrogation: "There are a lot of things that aren't clear," "Thats why I have to have time to redo everything that happened in my mind," and "I'm not sure as of now." He also wrote: "If its possible to get a lawyer now. We can finish the talk. He could direct me in the right direction where as without a lawyer I might saw something thinking that it means something else." And at another point he wrote: "Lets rap tomarrow. face to face. I can't give facts. If something happins that I don't know about." Before the interrogation ended, Mincey made two further requests for a lawyer.

[18] *E. g., Boulden* v. *Holman,* 394 U. S. 478, 480; *Clewis* v. *Texas,* 386 U. S. 707, 708; *Haynes* v. *Washington,* 373 U. S. 503, 513–514.

overborne.  Due process of law requires that statements obtained as these were cannot be used in any way against a defendant at his trial.

## III

For the foregoing reasons, the judgment of the Arizona Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, concurring.

I join the opinion of the Court, which holds that petitioner's rights under the Fourth and Fourteenth Amendments have been violated.  I write today to emphasize a point that is illustrated by the instant case, but that applies more generally to all cases in which we are asked to review Fourth Amendment issues arising out of state criminal convictions.

It is far from clear that we would have granted certiorari solely to resolve the involuntary-statement issue in this case, for that could have been resolved on federal habeas corpus. With regard to the Fourth Amendment issue, however, we had little choice but to grant review, because our decision in *Stone* v. *Powell,* 428 U. S. 465 (1976), precludes federal habeas consideration of such issues.  In *Stone* the Court held that, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.,* at 494 (footnotes omitted).  Because of this holding, petitioner would not have been able to present to a federal habeas court the Fourth Amendment claim that the Court today unanimously upholds.

The additional responsibilities placed on this Court in the wake of *Stone* become apparent upon examination of deci-

sions of the Arizona Supreme Court on the Fourth Amendment issue presented here. The Arizona court created its "murder scene exception" in a 1971 case. *State* v. *Sample*, 107 Ariz. 407, 409–410, 489 P. 2d 44, 46–47. A year later, when the defendant in that case sought federal habeas corpus relief, the United States Court of Appeals for the Ninth Circuit ruled, as we do today, that the exception could not be upheld under the Fourth Amendment. *Sample* v. *Eyman*, 469 F. 2d 819, 821–822 (1972). When the Arizona Supreme Court next gave plenary consideration to the issue, prior to our decision in *Stone*, it apparently felt bound by the Ninth Circuit's *Sample* decision, although it found the case before it to be distinguishable. *State* v. *Duke*, 110 Ariz. 320, 324, 518 P. 2d 570, 574 (1974).[1]

When the Arizona Supreme Court rendered its decision in the instant case, however, it took a different approach. The decision, issued nearly a year after *Stone*, merely noted that the Ninth Circuit had "disagreed" with the Arizona court's view of the validity of the murder-scene exception. 115 Ariz. 472, 482 n. 4, 566 P. 2d 273, 283 n. 4 (1977). It thus created an effective "conflict" for us to resolve. Cf. this Court's Rule 19 (1)(b). If certiorari had not been granted, we would have left standing a decision of the State's highest court on a question of federal constitutional law that had been resolved in a directly opposing way by the highest federal court having

---

[1] In its *Mincey* opinion, 115 Ariz. 472, 482, 566 P. 2d 273, 283 (1977), the Arizona Supreme Court indicated that one case other than *Sample* and *Duke* involved the murder-scene exception. *State ex rel. Berger* v. *Superior Court*, 110 Ariz. 281, 517 P. 2d 1277 (1974). The two-sentence opinion in the latter case, however, provides no explanation of the underlying facts and does not cite to either the Arizona court's or the Ninth Circuit's decision in *Sample*. There is thus no way to determine whether the situation in *Berger* was in any way comparable to those in *Sample, Duke,* and *Mincey,* nor any way to determine whether the *Berger* court simply disregarded the Ninth Circuit's *Sample* decision or instead, as in *Duke* (decided just two weeks after *Berger*), viewed *Sample* as distinguishable.

special responsibility for the State. Regardless of which court's view of the Constitution was the correct one, such nonuniformity on Fourth Amendment questions is obviously undesirable; it is as unfair to state prosecutors and judges— who must make difficult determinations regarding what evidence is subject to exclusion—as it is to state criminal defendants.

Prior to *Stone* v. *Powell,* there would have been no need to grant certiorari in a case such as this, since the federal habeas remedy would have been available to the defendant. Indeed, prior to *Stone* petitioner here probably would not even have had to utilize federal habeas, since the Arizona courts were at that earlier time more inclined to follow the federal constitutional pronouncements of the Ninth Circuit, as discussed above. But *Stone* eliminated the habeas remedy with regard to Fourth Amendment violations, thus allowing state-court rulings to diverge from lower federal-court rulings on these issues and placing a correspondingly greater burden on this Court to ensure uniform federal law in the Fourth Amendment area.

At the time of *Stone* my Brother BRENNAN wrote that "institutional constraints totally preclude any possibility that this Court can adequately oversee whether state courts have properly applied federal law." 428 U. S., at 526 (dissenting opinion); see *id.,* at 534. Because of these constraints, we will often be faced with a Hobson's choice in cases of less than national significance that could formerly have been left to the lower federal courts: either to deny certiorari and thereby let stand divergent state and federal decisions with regard to Fourth Amendment rights; or to grant certiorari and thereby add to our calendar, which many believe is already overcrowded, cases that might better have been resolved elsewhere. In view of this problem and others,[2] I hope that the

---

[2] The *Stone* holding has not eased the burden on the lower federal courts as much as the *Stone* majority might have hoped, since those courts have

Court will at some point reconsider the wisdom of *Stone* v. *Powell*.[3]

MR. JUSTICE REHNQUIST, concurring in part and dissenting in part.

Petitioner was indicted for murder, assault, and three counts of narcotics offenses. He was convicted on all charges. On appeal, the Supreme Court of Arizona reversed all but the narcotics convictions. 115 Ariz. 472, 566 P. 2d 273 (1977). In his petition for certiorari, petitioner challenged the introduction of evidence material to his narcotics convictions that was seized during a lengthy warrantless search of his apartment. Petitioner also challenged on voluntariness grounds the introduction of various statements made to the police relating to the murder charge. We granted certiorari, 434 U. S. 902, and the Court today reverses the Supreme Court of Arizona on both issues. While I agree with the Court that the warrantless search was not justifiable on the grounds advanced by the Arizona Supreme Court, I dissent from the Court's holding that Mincey's statements were involuntary and thus inadmissible.

I

I join Part I of the Court's opinion. As the Supreme Court of Arizona recognized, the four-day warrantless search of petitioner's apartment did not, on the facts developed at trial, "fit within [any] usual 'exigent circumstances' exception." 115 Ariz., at 482, 566 P. 2d, at 283. Instead, the State of

---

had to struggle over what this Court meant by "an opportunity for full and fair litigation of a Fourth Amendment claim," 428 U. S., at 494. See, *e. g., Gates* v. *Henderson,* 568 F. 2d 830 (CA2 1977); *United States ex rel. Petillo* v. *New Jersey,* 562 F. 2d 903 (CA3 1977); *O'Berry* v. *Wainwright,* 546 F. 2d 1204 (CA5 1977).

[3] A bill currently pending in the Congress would have the effect of overruling *Stone* v. *Powell.* S. 1314, 95th Cong., 1st Sess. (1977); see 123 Cong. Rec. 11347–11353 (1977).

Arizona asks us to adopt a separate "murder scene" exception to the warrant requirement and the Court, for the reasons stated in its opinion, correctly rejects this invitation.

I write separately on this issue only to emphasize that the question of what, if any, evidence *was* seized under established Fourth Amendment standards is left open for the Arizona courts to resolve on remand. *Ante,* at 395 n. 9. Much of the evidence introduced by the State at trial was apparently removed from the apartment the same day as the shooting. App. 40. And the State's brief suggests that some evidence— for example, blood on the floor—required immediate examination. Brief for Respondent 70–71. The question of what evidence would have been "lost, destroyed, or removed" if a warrant had been obtained, *ante,* at 394, otherwise required an immediate search, or was in plain view should be considered on remand by the Arizona courts.

In considering whether exigencies required the search for or seizure of particular evidence, the previous events within the apartment cannot be ignored. I agree with the Court that the police's entry to arrest Mincey, followed by the shooting and the search for victims, did not justify the later four-day search of the apartment. *Ante,* at 391–392. But the constitutionality of a particular search is a question of reasonableness and depends on "a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 878 (1975). See *Terry* v. *Ohio,* 392 U. S. 1, 19 (1968). In *Pennsylvania* v. *Mimms,* 434 U. S. 106 (1977), we held that once a motor vehicle had been lawfully detained for a traffic violation, police officers could constitutionally order the driver out of the vehicle. In so holding, we emphasized that the challenged intrusion was "occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car. We think this additional intrusion can only be described as *de minimis.*"

*Id.,* at 111. Similarly, in the instant case, the prior intrusions occasioned by the shooting and the police's response thereto may legitimize a search under some exigencies that in tamer circumstances might not permit a search.

## II

The Court in Part II of its opinion advises the Arizona courts on the admissibility of certain statements made by Mincey that are relevant only to the murder charge. Because Mincey's murder conviction was reversed by the Arizona Supreme Court, and it is not certain that there will be a retrial, I would not reach this issue. Since the Court addresses the issue, however, I must register my disagreement with its conclusion.

Before trial, Mincey moved to suppress as involuntary certain statements that he had made while confined in an intensive care unit some hours after the shooting. As the Court acknowledges, the trial court found " 'with unmistakable clarity' " that the statements were voluntary, *ante,* at 397 n. 12, and the Supreme Court of Arizona unanimously affirmed. 115 Ariz., at 479–480, 566 P. 2d, at 280–281. This Court now disagrees and holds that "Mincey's statements were not 'the product of his free and rational choice' " and therefore "cannot be used in any way against [him] at his trial." *Ante,* at 401, 402. Because I believe that the Court both has failed to accord the state-court finding the deference that the Court has always found such findings due and also misapplied our past precedents, I dissent.

As the Court notes, *ante,* at 398, past cases of this Court hold that a state-court finding as to voluntariness which is "not fairly supported by the record cannot be *conclusive* of federal rights." *Townsend* v. *Sain,* 372 U. S. 293, 316 (1963) (emphasis added). Instead, these cases require the Court to "make an independent determination *on the undisputed facts.*" *Stroble* v. *California,* 343 U. S. 181, 190 (1952) (emphasis added);

*Malinski* v. *New York,* 324 U. S. 401, 404 (1945). It is well established that, "for purposes of review in this Court, the determination of the trial judge or of the jury will ordinarily be taken to resolve evidentiary conflicts and may be entitled to some weight even with respect to the ultimate conclusion on the crucial issue of voluntariness." *Haynes* v. *Washington,* 373 U. S. 503, 515 (1963). See *Lisenba* v. *California,* 314 U. S. 219, 238 (1941); *Blackburn* v. *Alabama,* 361 U. S. 199, 205, and n. 5 (1960). Such deference, particularly on the resolution of evidentiary conflicts, "is particularly apposite because the trial judge and jury are closest to the trial scene and thus afforded the best opportunity to evaluate contradictory testimony." *Haynes, supra,* at 516.

The Court in this case, however, ignores entirely some evidence of voluntariness and distinguishes away yet other testimony. There can be no discounting that Mincey was seriously wounded and laden down with medical equipment. Mincey was certainly not able to move about and, because of the breathing tube in his mouth, had to answer Detective Hust's questions on paper. But the trial court was certainly not required to find, as the Court would imply, that Mincey was "a seriously and painfully wounded man on the edge of consciousness." *Ante,* at 401. Nor is it accurate to conclude that Detective Hust "ceased the interrogation only during intervals when Mincey lost consciousness or received medical treatment, and after each such interruption returned relentlessly to his task." *Ibid.*

As the Arizona Supreme Court observed in affirming the trial court's finding of voluntariness, Mincey's nurse

"testified that she had not given [Mincey] any medication and that [he] was alert and able to understand the officer's questions. . . . She said that [Mincey] was in moderate pain but was very cooperative with everyone. The interrogating officer also testified that [Mincey] did not appear to be under the influence of drugs and that

[his] answers were generally responsive to the questions."
115 Ariz., at 480, 566 P. 2d, at 281.

See App. 50–51 (testimony of Detective Hust), 63 and 66 (testimony of Nurse Graham).[1] The uncontradicted testimony of Detective Hust also reveals a questioning that was far from "relentless." While the interviews took place over a three-hour time span, the interviews were not "very long; probably not more than an hour total for everything." *Id.,* at 59. Hust would leave the room whenever Mincey received medical treatment "or if it looked like he was getting a little bit exhausted." *Ibid.* According to Detective Hust, Mincey never "los[t] consciousness at any time." *Id.,* at 58.

As the Court openly concedes, there were in this case none of the "gross abuses that have led the Court in other cases to find confessions involuntary, such as beatings . . . or 'truth serums.'" *Ante,* at 401. Neither is this a case, however, where the defendant's will was "simply overborne" by "mental coercion." Cf. *Blackburn* v. *Alabama, supra,* at 206; *Davis* v. *North Carolina,* 384 U. S. 737, 741 (1966); *Greenwald* v. *Wisconsin,* 390 U. S. 519, 521 (1968). As the Supreme Court of Arizona observed, it was the testimony of both Detective Hust and Nurse Graham "that neither mental or physical force nor abuse was used on [Mincey] . . . . Nor were any promises made." 115 Ariz., at 480, 566 P. 2d, at 281. See App. 58–59 (testimony of Detective Hust) and 63 (testimony of Nurse Graham). According to Mincey's own testimony, he wanted

---

[1] The Supreme Court of Arizona also emphasized "the fact that [Mincey] was able to write his answers in a legible and fairly sensible fashion." 115 Ariz., at 480 n. 3, 566 P. 2d, at 281 n. 3. The Court concedes that "Mincey's answers seem relatively responsive to the questions," *ante,* at 400 n. 16, but chooses to ignore this evidence on the ground that the "reliability of Hust's report is uncertain." *Ibid.* Despite the contrary impression given by the Court, *ibid.,* the Arizona Supreme Court's opinion casts no doubt on the testimony or report of Detective Hust. The Court is thus left solely with its own conclusion as to the reliability of various witnesses based on a re-examination of the record on appeal.

to help Hust "the best I could" and tried to answer each question "to the best of my recollection at the time that this was going on." *Id.*, at 86. Mincey did not claim that he felt compelled by Detective Hust to answer the questions propounded.[2] Cf. *Greenwald, supra,* at 521.

By all of these standards enunciated in our previous cases, I think the Court today goes too far in substituting its own judgment for the judgment of a trial court and the highest court of a State, both of which decided these disputed issues differently than does this Court, and both of which were a good deal closer to the factual occurrences than is this Court. Admittedly we may not abdicate our duty to decide questions of constitutional law under the guise of wholly remitting to state courts the function of factfinding which is a necessary ingredient of the process of constitutional decision. But the authorities previously cited likewise counsel us against going to the other extreme, and attempting to extract from a cold record bits and pieces of evidence which we then treat as the "facts" of the case. I believe that the trial court was entitled to conclude that, notwithstanding Mincey's medical condition, his statements in the intensive care unit were admissible. The fact that the same court might have been equally entitled to reach the opposite conclusion does not justify this Court's adopting the opposite conclusion.

I therefore dissent from Part II of the Court's opinion.

---

[2] While Mincey asked at several points to see a lawyer, he also expressed his willingness to continue talking to Detective Hust even without a lawyer. See *ante,* at 399–400, n. 16. As the Court notes, since Mincey's statements were not used as part of the prosecution's case in chief but only in impeachment, any violation of *Miranda* v. *Arizona,* 384 U. S. 436 (1966), was irrelevant. See *Harris* v. *New York,* 401 U. S. 222 (1971); *Oregon* v. *Hass,* 420 U. S. 714 (1975).