## 39211. OVERMAN v. THE STATE.

HILL, Chief Justice.

Royal Charles Overman, Jr., was tried and convicted of the murder of Patricia Richardson and was given a life sentence. He appeals.

On the afternoon of Sunday, August 23, 1981, Alice Hopkins called the defendant at his home. They had met at a bar the night before, and she had taken his phone number. She said she'd be over to see him that afternoon. After she arrived, she and the defendant sat in his apartment, talking and drinking. During the course of their conversation, the defendant told Alice Hopkins that he had lived with the victim, Patty Richardson, for two years, that they had separated in April, that he did not see her often anymore, but that he still loved her.

At about 9:00 p.m., the defendant and Alice Hopkins went into the bedroom where they sat on the bed talking and playing with the defendant's new puppy, which had recently been given to him by the victim. She removed her bra at his suggestion and because she felt it was too tight. The phone rang, but the defendant did not answer it. Thereafter, he played back from his telephone tape recorder a message left by the victim indicating that she had some bones for the puppy which she was going to bring over, but since he was not at home (because he had not answered the telephone) she would bring them another time. The defendant told Alice Hopkins that the female caller was a friend, but he did not think she was coming over.

At about 11:00 p.m., the defendant indicated that he was tired and took off his pants, and she said it was time for her to go home. At 11:30, they heard the front door open and someone came in. The defendant yelled: "Pat, don't come in here." A female voice answered: "Chuck, are you sick?" The defendant continued to holler "Pat, don't come in here" as he rummaged through some clothes in his top dresser drawer. Just as Alice Hopkins caught a glimpse of a red blouse in the lighted hallway, she saw the defendant fire his .357 magnum pistol. The victim fell. He ran over to the victim to plead with her not to die and told Alice Hopkins to call an ambulance and the police.

Then he told her to leave, which she did.

The victim subsequently died from a bullet which entered her head over her right eye.

The police arrived a few minutes later, entered and found the defendant holding the victim. The police were directed to the defendant's magnum pistol located in the bedroom by the defendant, who claimed he woke up and heard someone in his apartment and that the shooting was an accident. When the first officer entered the apartment, the victim's 23-year-old son, who had been sitting in the car waiting for his mother to deliver the bones to the defendant, also ran in. The defendant admitted to the police and to the son that he had shot the victim. He and the victim's son got into a scuffle at one point and had to be restrained. The policemen, during their investigation, confiscated the defendant's pistol, which contained the one spent round and several live rounds, the telephone tape recorder located in the bedroom, as well as another gun, a .32 pistol, which the defendant told them was in his car, Alice Hopkins' bra, the victim's wig and purse, and several papers and nightgowns found in the apartment. Alice Hopkins did not come forward after the murder, but after several days investigation she was located.

At trial, the defendant testified that he was tired that night, that he had not heard the phone ring and had not listened to the taped message, that Alice Hopkins stayed longer than he expected, that they were sitting on top of the bed with their backs to the headboard, and that he had dozed off. He was awakened by the sound of the front door opening and was frightened by the unexpected intruder, whom he was afraid might be Alice Hopkins' husband (from whom she was then separated), that he had called out to the person to leave, that he did not know who it was and that he had tried to shoot above the approaching shadow of the person he saw and heard in the hallway. He also stated that he did not know the person was the victim and that she always knocked and waited for him to answer the door when entering the apartment. He admitted that the victim had spent the night with him on Friday night, but that he had not seen her on Saturday after work, that he met Alice Hopkins at a local bar and had given her his phone number and told her to call him sometime, that he had then left her and gone to the NCO Club at Dobbins Air Force Base, that he had seen the victim there and said hello to her, but that she was with some girl friends and he had then gone home alone. He spent all day Sunday at home alone until Alice Hopkins called him, and he had three or four drinks during her visit.

Evidence was also admitted during the trial tending to show that the relationship between the defendant and the victim had always been up and down, and, since they had separated in April, had been

mostly downhill. A witness, Belinda Taylor, who had spent Saturday night with the victim visiting several bars, had seen the meeting between the defendant and the victim at the NCO Club around midnight, at which time they appeared to have had an argument which greatly upset the victim, causing her to run out of the club. Another witness, Don Adams, a friend of the defendant, testified that sometime in May he had seen the defendant and the victim "shoving and pushing and Chuck swiped at her one time," hitting her on the cheek. Also, earlier that August at the NCO Club, Adams reported that the defendant had insisted that the victim sit with Adams and his wife because the defendant was angry with the victim for talking to and dancing with other men. At one point she said to him: "Well, I'm not going to give you any more money." He pointed his finger at her and said: "Shut your mouth or I will kill you." Soon after, Adams saw the defendant in the hallway where he had the victim's arm twisted up behind her, while arguing with her.

1. The evidence is sufficient to allow a rational jury to find the defendant guilty of murder beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The requisite malice aforethought can be formed in a moment, and the jury was not required to believe the defendant's testimony that he did not intend to kill the victim. *Walker v. State,* 240 Ga. 608 (1) (242 SE2d 118) (1978). Therefore, enumerations of error 8 and 9 raising the sufficiency of the evidence in the form of the failure of the trial court to grant directed verdicts of acquittal at the close of the state's case and at the close of the case have no merit.

2. Enumerations of error 1, 2 and 3 raise questions regarding the failure to suppress and admission of and manner of playing the telephone tape recorder message. The defendant argues that the police had no right, without first obtaining a warrant, to seize the telephone tape recorder from his bedroom. It is clear, however, that the police had entered the defendant's apartment with his consent and, after observing the victim, could seize and secure possible evidence in plain view while investigating the scene. *Gainey v. State,* 132 Ga. App. 870 (2) (209 SE2d 687) (1974); OCGA § 17-5-1 (Code Ann. § 27-301). Compare State v. Dowling, 387 S2d 1165, 1168-69 (La. 1980), with Mincey v. Arizona, 437 U. S. 385 (1) (98 SC 2408, 57 LE2d 290) (1978). 2 LaFave, Search and Seizure § 6.5 (e) pp. 458-66 (1978). We find no error in the overruling of the motion to suppress. Since the evidence was lawfully seized, there was no error in its admission into evidence.

Furthermore, the defendant has shown no error in the manner in which the tape was played to the jury. A portion of the tape was first played to enable the victim's son to identify the voice as that of the

victim. The defendant then requested that the tape be played in its entirety, which was done. We find no error here.

3. We find no reversible error in the remaining enumerations of error.

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 25, 1983.

*Jimmy W. Jones,* for appellant.

*Thomas J. Charron, District Attorney, James F. Morris, Assistant District Attorney, Michael J. Bowers, Attorney General, Mary Beth Westmoreland, Assistant Attorney General,* for appellee.

