[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO SUPPRESS
In this case the defendant, Ivan J. Blades, has been charged with murder in violation of General Statutes section53a-54a. The information alleges that on or about the 30th day of November the defendant caused the death of Dorothy Blades with intent to do so.
The defendant has moved to suppress and exclude from trial any evidence derived from entry into the dwelling of the defendant by officers of the New London Police Department on or about November 30, 1988, including but not limited to the fact of the death of Dorothy Blades and any physical evidence located within the dwelling. The defendant further seeks to suppress all items seized pursuant to search warrants issued and executed in connection with the investigation and prosecution of the alleged homicide.
The Court makes the following findings of fact. On November 30, 1988, Detective David A. Gigliotti of the New London Police Department was serving as a dispatcher on duty at the police department. At 11:06 p. m., he received a telephone call placed by Hattie Sanders from the Bronx, New York. Mrs. Sanders advised Detective Gigliotti that she was the mother of Dorothy Blades and the mother-in-law of the defendant. Mrs. Sanders reported to Detective Gigliotti that the defendant and her daughter had been involved in marital difficulties and said, "I think something has been done to her."
She said that earlier in the day the two children of the couple, ages 6 or 8 and 12, had arrived in New York unaccompanied and that she felt that was very unusual. The children told her that they had been sent to New York by the defendant who told them that their mother was at Mrs. Sanders' CT Page 871 home and that their uncle was either ill or injured. Mrs. Sanders said that Mrs. Blades was not at her home and that no uncle of the children was ill.
Mrs. Sanders requested that the New London police check the Blades' apartment located at 78 Dell Avenue, New London. At 11:17 p. m., Detective Gigliotti dispatched Officer Dan Forier to check the Blades' residence.
At 11:24 p. m., Detective Gigliotti received a telephone call placed by Diane Blades Coleman from New York. Mrs. Coleman advised him that she was the sister of the defendant and that the defendant had called her earlier that day and said that he had placed the children on the train to New York and requested that she pick up the children at the train station. Mrs. Coleman reported that she did pick up the children and they advised her that their father had told them that their mother had come to New York earlier and that they had been sent to New York because an uncle was either sick or injured. Mrs. Coleman said that she had spoken with Mrs. Sanders and had been told that no uncle of the children was ill and that it was very unusual for the children to be placed on a train unaccompanied by an adult.
At 11:29 p. m., Officer Forier called Detective Gigliotti and reported that he had gone to the Blades' apartment, had identified himself as a policeman and the defendant had said through the door of the apartment that his wife had gone to New York City earlier in the day and that she was in New York. Officer Forier had said nothing about the defendant's wife to the defendant.
At 11:29 a.m., Detective Gigliotti called the Nutmeg Pavilion, Mrs. Blades' employer, and was advised that Mrs. Blades' child had called from New York and inquired whether or not Mrs. Blades had been seen or heard from.
Between 11:58 p. m. and 12:41 a.m., Mrs. Sanders and Mrs. Coleman called repeatedly and expressed concern about the unexplained absence of Mrs. Blades. At 12:41 a.m. Mrs. Coleman asked the police to enter the Blades' apartment.
At 12:59 a.m., Detective Gigliotti and the other officers involved in the case decided there was reason to believe that someone was either injured or in danger of being injured or dead in the apartment and that it would be necessary to enter the apartment immediately to protect or preserve life. Detective Gigliotti then left the police station and went to Dell Avenue. CT Page 872
At 12:59 p. m., Detective Gigliotti was advised by Sergeant John Weinberg on the police radio that a family friend had gone to the apartment and the defendant had told the friend everything was fine. Sergeant Weinberg said he immediately went to the apartment and attempted to make contact with anyone inside. He heard music in the apartment, but received no response when he knocked on the door.
At the apartment building Detective Gigliotti and three other officers entered the rear doorway of the building. Detective Gigliotti observed a blood smear on the interior side of the door leading to a common hallway. He went upstairs to the Blades' apartment and heard no sounds in the apartment.
At 1:09 a.m., Detective Gigliotti knocked on the door and rang the bell to the apartment, but received no response. He then used a pass key which he had obtained from the apartment manager to open the door to the apartment and entered the apartment. He observed blood smears on the wall in the rear hallway and a large amount of blood in the bathroom. He pulled back the shower curtain and saw a blood soaked blanket in the shower in which the body of the victim was found.
A search warrant was subsequently obtained and the apartment was searched pursuant to the warrant.
The issue presented by the defendant's motion to suppress is whether the "emergency doctrine" exception to the warrant requirement justified the warrantless entry into the defendant's apartment.
"Warrantless searches and seizures inside a home are presumptively unreasonable." Payton v. New York, 445 U.S. 573,586, 100 S.Ct. 1371, 63 L.Ed. 639 (1980). The burden is on the state to show that an exception exists. State v. Harris,10 Conn. App. 217, 224 (1987).
The leading United States Supreme Court case of Mincey v. Arizona, 437 U.S. 385, 392, 98 S.Ct. 2408,57 L.Ed.2d 290 (1978), recognized the right of police to respond to emergency situations, and held that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."
In the recent case of State v. Klauss, 19 Conn. App. 296,300 (1989), the Appellate Court said that the "emergency" exception refers to a "type of warrantless entry that evolves outside the context of a criminal investigation and does not CT Page 873 involve probable cause as a prerequisite for the making of an arrest or the search for and seizure of evidence." At page 302, the Court set forth the test to be employed in an emergency doctrine case as "whether, under the totality of the circumstances, a well-trained police officer reasonably would have believed that a warrantless entry was necessary to assist a person inside in need of immediate aid."
In the Klauss case, the Court held that a warrantless entry into the defendant's home was justified under the emergency doctrine where the police had received information that the defendant had reason to be very depressed, was intoxicated, armed with a gun and possibly suicidal and the court found that the police believed that the defendant was in immediate need of aid, that their only purpose in entering the apartment was to protect the defendant and others and that the defendant had not been located at the time of their entry into his home. After noting that there was no evidence that the entry was pretextual, the court said, at page 303, that "(a)s long as there is an objectively reasonable belief upon which the entry is predicated, it will be sustained even if it develops that no emergency did exist."
In the present case the facts and circumstances known to Detective Gigliotti support an objectively reasonable belief that entry into the defendant's apartment was necessary to protect or preserve life. Such facts and circumstances include: the sending by the defendant of his two young children unaccompanied on a train to New York with a patently false reason for doing so; the domestic difficulties of the defendant and his wife; the repeated calls by members of the couple's families, including the defendant's own sister, expressing concern about the victim's unexplained absence; the defendant's bizarre reference to his wife when he was first contacted by the police; and the defendant's failure to respond to two attempts by police to contact him at his apartment soon after he had responded to a family friend at the apartment.
For the reasons stated above, the defendant's motion to suppress is denied.
HENDEL, J.