JOHNSTONE, Justice
(dissenting).
I respectfully dissent from the decision to quash this writ. On April 22, 1999, Jerry Bernard Houston was convicted of criminally negligent homicide and was sen-fenced to serve ten months in jail and to pay certain sums of money. Upon Houston’s appeal, the Court of Criminal Appeals affirmed his conviction, with an opinion. Houston v. State, 798 So.2d 704 (Ala.Crim.App.2000). On May 19, 2000, the Court of Criminal Appeals overruled Houston’s application for rehearing and denied his Rule 39(k), Ala.R.App.P., motion. Houston petitioned this Court for certiorari review of the decision of the Court of Criminal Appeals. We granted the writ to determine whether the trial court erred in denying Houston’s motion to suppress the statement taken by Officer Robert Hyde in a hospital emergency room immediately after the homicide occurred. Because Houston’s statement was not given knowingly, intelligently, and voluntarily, I respectfully submit that the trial court did err to reversal in this ruling.
Houston was admitted to the Grove Hill Memorial Hospital emergency room for treatment at 1:20 p.m. on May 15, 1998,[1] (C.R. 119, R. 247.), the day of the killing. Houston’s condition was classified as “trauma” and “critical,” and he was “initially alert and oriented, but slightly groggy.” (C.R. 119, 130, and R. 246.) At 1:30 p.m. the hospital personnel started intravenous medication (“lactated, Ringer’s, one hundred cc’s an hour”) on Houston. (C.R. 126, R. 247.) At 1:45 p.m. Houston, then unresponsive and bleeding from his nose and mouth, received Valium intravenously because he had already suffered a grand mal seizure while he was in the in X-ray department. (C.R. 126, R. 247.) Explaining the hospital records, Dr. Garrett Miller, the medical director of the emergency *711 room at Grove Hill Memorial Hospital, testified, “So, somewhere between 1:30 and 1:45 this man experienced a grand mal seizure. No question in my mind what caused the grand mal seizure was the head injury.” (R. 247-48.)
Officer Hyde arrived at the hospital at 1:27 p.m. (R. 255.) Immediately upon his arrival, Officer Hyde went to interrogate Houston in the trauma room, where a couple of hospital personnel were the only other people present. Hyde testified that, although Houston was lying on a gurney and his face was bloody, Houston’s speech was coherent and Houston appeared to understand his Miranda rights. (R. 253.) Hyde testified that, although he did not have Houston sign a written waiver of his rights, as was the policy of the police department, Houston orally waived his Miranda rights and made a statement. Hyde purported to transcribe Houston’s statement without noting the time and without having Houston sign the statement. Hyde testified that he did not have Houston sign the statement because the nurses in the emergency room were “busy on him.” (R. 221.) Hyde admitted that his failure to note the time of the statement and to get Houston’s signature was against normal police procedure. (R. 219-20.) Hyde testified that he did not recall whether he was present when Houston began to seize. (C.R. 26-61.)
At 2:25 p.m., Houston was intubated because he was having difficulty breathing on his own. At 4:15 p.m., Houston, in critical condition, wras flown by SouthFlight to the University of South Alabama Medical Center and admitted with multiple facial and skull fractures, seizures, and trauma to the head and face. (C.R. 126,129.) Two days later, a CT (computerized tomography) scan of Houston’s face revealed “[f]rac-tures involving the right orbital roof, superior and inferior left frontal sinus walls, inferior right front sinus wall, anterior left maxillary sinus wall, left nasal bone and bilateral posterior aspect of the lateral orbital walls.” (C.R. 180.) Houston was discharged on May 18, 1998. (R. 146.)
Houston’s statement reads as follows:
“I went to Emma Lee White’s house. My wife was hanging up clothes. She was coming out [the] back door. I asked her what was going on. She said nothing. I went in the back. Maxie Ely [the alleged victim] was in the back room on the left. I carried a rifle in the house with me. I pushed the door open. Maxie got the rifle and broke the stock. He started beating me with the rifle and his fists. He picked me up off the floor, and I passed out. When I woke up, Maxie was lying on the floor. I staggered over him and walked out the back door. There was no one else in the house.”
(C.R. 115.) Houston moved to suppress the statement on the ground that it was not knowingly, intelligently, and voluntarily made. Houston introduced his hospital records to establish that, at the time he gave his statement to Officer Hyde, he had suffered head trauma so severe that he suffered a grand mal seizure within minutes of his admission to the emergency room. Dr. Garrett Miller testified that Houston’s medical records from his May 15th emergency room visit revealed that, although Houston “was awake and ... was in some way aware of what [was] going on around him,” (R. 246.), he presented with such significant head/brain injury that a CT (computerized tomography) scan was ordered. (R. 239.) Dr. Miller testified that, in the medical condition indicated by the hospital records, Houston could not have understood his constitutional rights and could not have knowingly, intelligently, and voluntarily made a statement to Officer Hyde. (R. 240-41.) The State did *712 not introduce any countervailing medical evidence. The trial court denied Houston’s motion to suppress and admitted the statement.
In its case in chief the State did not present any evidence other than Houston’s statement to place Houston at the scene of the crime. Forensic tests on the gun found at the scene did not include blood type testing and did not yield any fingerprints (R. 182, R. 185, C.R. 83.). No evidence was admitted that the gun found at the crime scene belonged to Houston. No witness placed Houston at the scene of the crime. Without the introduction of Houston’s statement, the subject of his motion to suppress, to place him at the scene of the crime, the State’s proof in its case in chief would not have constituted a prima facie case against him.
“A confession is prima facie involuntary and inadmissible, and the State must show voluntariness and a Miranda predicate in order to admit it. Whether a waiver is voluntarily, knowingly and intelligently made depends upon the particular underlying facts and circumstances of each case, including the background, experience, and conduct of the accused — the totality of the circumstances. The question of whether a confession or inculpatory statement was voluntarily made is one of law, to be determined by the trial judge. The finding of the trial judge will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly torong. The trial court need only be convinced from a preponderance of the evidence to find a confession or inculpatory statement to have been voluntarily made.”
Ex parte Woods, 592 So.2d 636, 637-38 (Ala.1991) (citations omitted and emphasis added). While the State tried to impeach the testimony of Dr. Miller by eliciting that he was not Houston’s treating physician, the burden is on the State itself to prove that a defendant has given his statement knowingly, intelligently, and voluntarily. Ex parte Callahan, 471 So.2d 463, 464 (Ala.1985). The evidence in the case before us, in the context of the prima facie involuntariness and inadmissibility, Woods, supra, of Houston’s statement, meets the test for reversing the ruling by the trial court: its finding that - the statement was admissible is contrary to the great weight of the evidence and manifestly wrong. Woods, supra. See, e.g., Mincey v. Arizona, 437 U.S. 385, 397-402, 98 S.Ct. 2408, 2416-18, 57 L.Ed.2d 290 (1978). Therefore, I would reverse the judgment of the Court of Criminal Appeals affirming the trial court’s denial of Houston’s motion to suppress.
HARWOOD, J., concurs.

. Al R. 239 the transcript represents Dr. Garrett Miller’s testimony to be that, "[bjasically the [hospital] records reflect ... at around 1:30 p.m. [the defendant] presented to the Grove Hill emergency room.” The time of admission entered on the emergency room record Dr. Miller was reading, however, is 1:20 p.m. (C.R. 119.) Dr. Miller later recognized 1:20 p.m. as the time of admission and 1:30 p.m. as the time of administration of the first intravenous medication. (R. 247, C.R. 126.)