DECISION AND JUDGMENT ENTRY
This is an appeal from a March 30, 1999 judgment entry of the Erie County Court of Common Pleas in which the court accepted no contest pleas entered by appellant, Frederick Luipold, to two counts of possession of a dangerous ordinance in violation of R.C. 2923.17(A), found appellant guilty of the charges and sentenced him to concurrently serve two sentences of two years of community control. Appellant has presented one assignment of error that is:
 "I. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT FAILED TO SUPPRESS EVIDENCE ILLEGALLY SEIZED BY OFFICERS WHILE CONDUCTING A WARRANTLESS ENTRY IN AN APPARENT EMERGENCY."
Before addressing the sole assignment of error presented, we will review the facts and procedure in this case.
On July 20, 1998, the grand jury sitting in Erie County Ohio filed an indictment in the Erie County Court of Common Pleas charging appellant with two counts of possession of a dangerous ordnance in violation of R.C. 2923.17(A). Specifically, he was charged with possessing two fully automatic firearms.
Appellant initially entered not guilty pleas to the charges. He then filed a motion to suppress, arguing that all the items taken from his home were found as a result of a warrantless search of his residence. He argued that no exception to the requirement for a warrant applied in his case, the search was illegal and all evidence seized during the search should be excluded from evidence.
A hearing was held on appellant's motion to suppress on October 22, 1998. At the hearing, several individuals testified about the events that led to the discovery of fully automatic firearms in appellant's home and to his being charged in this case.
The first witness at the hearing on the motion to suppress was a reserve officer for the Sandusky Police Department. He testified that his full-time occupation is as a plumber, and that he is well acquainted with appellant, who also works as a plumber. The reserve officer testified that he was on duty with the Sandusky Police Department on the evening of December 31, 1996. He said he received a voice mail message from appellant's cousin on his beeper. He called her back and learned that she had received a call from appellant's former girlfriend's mother alerting her that appellant was talking on the phone with his former girlfriend, and that he was threatening to commit suicide.
The reserve officer told appellant's cousins that he was on duty, and they asked if he could just go to appellant's residence to check on his well-being. When appellant's cousin by marriage testified, she explained that her husband was in bed sick that night and that is why they thought of calling the reserve officer in the first place. They knew him to be appellant's friend and they knew he carried a pager. They did not know, until they talked with him on the telephone, that he was working as a reserve officer that night.
The reserve officer and his partner agreed to make an unofficial check on appellant at his home. When they arrived, they knocked on the front door. Appellant did not answer. Next, they knocked on the back door. Again, appellant did not answer.
The officers then tried calling appellant on the telephone, but they got a busy signal. They tried knocking on the doors again, but they still got no answer. They again tried to call him on the telephone, but appellant let his answering machine come on and would not answer their calls.
The reserve officer then called appellant's cousins back and asked them what they wanted to do since appellant would not answer his doors or his telephone. They said they would meet him at appellant's home.
Appellant's cousins did arrive at the scene and they discussed what to do with the reserve officer and his partner. The cousins had the key to appellant's home, but the reserve officer testified they were all afraid to use it to enter appellant's home because they were aware that he owned a lot of guns. The cousins reported to the officers that he had previously made remarks that if anyone entered his home unannounced, he would shoot first and ask questions later.
The reserve officer spoke with appellant's former girlfriend, and she confirmed that she had been talking to appellant on the telephone that night. She reported that he had been threatening to commit suicide before the night was over, and also reported that he was talking about fellow officers who allegedly died while he was in military service. Neither the former girlfriend, the reserve officers, nor appellant's cousins knew of appellant ever serving in the military, and they concluded that he might be delusional.
The officers decided they needed to make an official report of the situation, and their supervisor called in the Special Response Team ("SRT"). The officers and appellant's cousins went to the police station to meet with the members of the SRT. The reserve officer drew a rough floor plan of appellant's house, and informed the SRT that appellant had a gun collection that he kept in a room in his basement, under his front porch. The reserve officer had seen the collection when visiting appellant in the past as a friend, and he told the SRT he recalled appellant telling him that the room where the collection was kept was booby-trapped.
The testimony of the commander and the members of the SRT confirmed that they met with appellant's cousins and with the reserve officer at police headquarters. They interviewed appellant's cousins and the reserve officer. They learned that appellant had also once served as a reserve officer for the Sandusky Police Department, however they all testified that they did not remember appellant. They learned that appellant was apparently suicidal, and that he had a large collection of guns in his home. They also learned that the door to the room where the collection was kept in the basement might be booby-trapped. They had their hostage negotiator stay behind at police headquarters with appellant's cousins and directed him to keep trying to contact appellant on the telephone.
Once they arrived at appellant's home, they began trying to see into his home. They testified that nearly all the lights in the home were turned on, but the windows were blocked by shades or curtains or were too high up for them to see through from the ground. Eventually, (the reconnaissance of appellant's home by the SRT lasted more than an hour) they used appellant's ladder to climb onto the roof of his garage. The officer on the garage roof was able to see an individual lying on the floor of the front room of the house, just a few feet from the front door. The person lying on the floor was covered by a blanket or a sheet and had guns lying on the floor within his reach. He was not moving and did not appear to have any wounds.
The decision was then made to enter the house from the front door using the key provided by appellant's cousins. The SRT members went to the front door, using a shield in front of them, unlocked the door and rushed inside. They handcuffed appellant, who was the individual lying on the floor under a blanket, so that he could not reach any of the guns he had on the floor. The SRT members agreed in their testimony that the person on the floor was restrained within no more than two minutes from the time they approached the house and went inside.
The SRT commander testified that he asked the person if he was appellant, but that the person did not answer him. He said he stayed with the person he later learned was appellant while other members of SRT followed through with their protocol and began what they referred to as a "sweep" of the rest of appellant's home. The reserve officer also entered the house after two minutes and stayed with appellant. He testified that while he was with appellant, the SRT members were still looking through the other rooms in appellant's home. He also testified that appellant was conscious, and was threatening him.
The remaining SRT members testified that they quickly moved from room to room looking for anyone else who might be a victim, a hostage, or a threat to their safety. All of the SRT members testified that this procedure was their "protocol" and admitted that they did not have any reports that anyone other than appellant was in the house or at risk.
Two members of the SRT testified that they went through the kitchen and down into the basement. While in the basement they found the room where appellant kept his gun collection stored. They both testified that the door to the room was open. One officer checked around the door for a booby-trap. He found none, so he quickly ducked inside the room. Once inside the room, the officers saw at least two firearms that they believed, based upon their past military service and training for the SRT, to be fully automatic weapons. Both admitted that their initial impression could only be verified by taking the weapons from appellant's home and test firing them.
They summoned the SRT commander, who joined them in the basement. He testified that appellant had already been removed from his home and was being transported to the hospital in a rescue squad when he went to the basement.
He testified that he made the decision to confiscate all of the guns in appellant's collection, even the ones that were clearly legal to possess. He said: "The reason why is because you have all that — you have all these guns in a residential neighborhood and I don't know what Mr. Luipold's mental state is." He admitted that appellant was not under arrest when they removed the guns, he had only been taken to the hospital for evaluation. When appellant was released from the hospital he was taken to police headquarters and was placed under arrest.
The SRT member who had been on the garage roof and first saw appellant lying on a floor under a sheet or blanket testified that he came into the house after the rest of the team had already entered, because he remained on the garage roof with appellant in his gun sites while the other team members entered the house. Once they were inside, he climbed down from the garage roof, went inside the house and joined in the "sweep" of the residence. He testified that when he walked past the person who was handcuffed on the floor, he noticed that the person matched the description the SRT had been given of appellant. He was one of the two officers who made the sweep of the basement, and who found and entered the room where appellant kept his gun collection. He identified the guns that caused him concern on site, and conceded that each of them could have been semi-automatic, legal weapons. However, he said that based upon his experience, the weapons were generally fully automatic.
At the conclusion of the testimony from the witnesses called by the state, the parties entered into a stipulation. Appellant's trial counsel explained the stipulation as follows:
 "Your Honor, Mr. Reno and I have talked and I believe the stipulation would go something like the SRT team, as a matter of protocol, sweeps the entire scene no matter what they come upon in the initial entry. So specific to this case, if they had known it was Mr. Luipold on the floor, they still would have swept the house to make sure there was nothing else, victims, anything like that in the house."
Appellant called three witnesses at the hearing. The first witness was his cousin by marriage, who paged the reserve police officer on New Year's Eve to ask him to check on appellant. She testified that when she and her husband gave the police the key to appellant's residence, it was with an expectation that they would help appellant. She said they did not discuss with or authorize the police to conduct a search of appellant's home.
The second witness called by appellant was the paramedic who took care of appellant and rode with appellant, along with the reserve officer, in the rescue squad to the hospital. The paramedic testified that he and his co-workers replaced the first team that was at the scene waiting for the SRT to enter appellant's home, because the first team had to respond to another call. He said he waited in the rescue squad while the SRT went into appellant's home. He stayed there until he was told appellant's residence was secure. He said that from the time he arrived at the scene until he helped carry appellant out of the house on a cot, a total of eleven minutes went by. He testified that he was not in the house for more than five minutes.
The final witness called by appellant was an investigator hired by appellant's trial counsel to take pictures and measurements of the inside of appellant's home. His testimony helped to show that appellant was in the first room entered by the SRT members, and that he was quite close to the door they came through.
At the close of the testimony, both parties made closing statements, and the trial court took the matter under consideration. On March 30, 1999, the trial court filed a judgment entry in which it denied appellant's motion to suppress. The court made findings of fact and conclusions of law.
The court found that "the officers acted in good faith in the performance of their duties in an emergency situation, acting for the protection of life and property." The court said the motivation for the search was concern for safety, not an intent to arrest appellant or to seize evidence. The court also said there was "a reasonable basis associating the emergency with the area searched."
The court then ruled that no warrant was required in this case, because the facts showed an emergency situation existed when the police entered and searched appellant's home. The court further ruled that the officers did not exceed acceptable boundaries when they conducted a sweep of the entire residence and that the guns were legally seized under the plain view doctrine. The court said the officers were in an area they were lawfully allowed to be when they saw at least one gun in plain view that was immediately apparent to be illegal.
As this court has previously said:
 "An appellate court reviews whether substantial evidence supports a trial court's decision on a motion to suppress. Maumee v. Johnson (1993), 90 Ohio App.3d 169, 171. The trial court acts as the trier of fact and is in the best position to resolve questions of fact and determine witness credibility. State v. Johnston
(1993), 85 Ohio App.3d 475, 477. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. State v. Guysinger (1993), 86 Ohio App.3d 592, 594." State v. Jenkins (Mar. 31, 1998), Lucas App. No. L-97-1303, unreported.
At the same time, this court will independently decide questions of law. State v. Vorous (Feb. 22, 1994), Stark App. No. CA-9414, unreported. Keeping these standards of review in mind, we now consider the arguments presented regarding appellant's sole assignment of error.
In support of his sole assignment of error, appellant argues that the trial court erred when it ruled that no warrant was needed in this case before the police searched his home. He asserts several different bases for his assertion that a warrant was required.
First, he argues that when his cousins gave the police a key to his home, they only gave consent to find and assist him, not to make a full search of his house. He argues that the search of the basement far exceeded the scope of the limited consent his cousins gave the police to enter his home.
Second, he argues that because the police took so long from the time of the initial call until the time they actually entered his home (four to five hours later), it is clear that they could have gotten a search warrant. He argues that no exigent or emergency situation existed to justify a warrantless entry and search of his home.
Third, he argues that even if an emergency situation did still exist, the scope of the search far exceeded the scope of what was reasonably needed to address the emergency. He says that once the police located and handcuffed him, they had no need to further search his home. He stresses that their "emergency" was a need to prevent him from carrying out his threat to commit suicide, and that they had no reason to believe that anyone else was present in his home or that they were in danger.
Fourth, he argues that the situation in this case was clearly not a search incident to an arrest, since he was not placed under arrest until after he was taken to the hospital. He says that even if this did qualify as a search incident to an arrest, the area that could legitimately be searched under that exception to the requirement for a warrant would be the area immediately around his person and within his control. He says that area would not include the basement in his home. He says once the police put him in handcuffs, any threat to their safety ended, and no justification remained for them to search his entire home.
Finally, he argues that the police could not rely upon the plain view exception to the requirement of a warrant to justify their seizure of his gun collection. He says that the police first must have a legitimate right to be in the area where an object is in plain view before they may use that exception to the requirement to have a warrant to seize evidence. He again asserts that the police had no legitimate reason to be in the basement of his home once he was found and handcuffed.
Appellee, the state, responds that the trial court was correct when it ruled that exigent circumstances justified the police officers' warrantless entry of appellant's residence and the subsequent sweep of the entire home, including the basement. Appellee argues that since the officers were legally in the basement, the plain view exception to the requirement for a warrant applied and justified the seizure of contraband the officer saw.
Appellee says the police officers were acting in their role as protectors of community health, safety and protection when they entered appellant's home. Appellee recounts the events that transpired in this case and then says:
 "The police had no way of knowing whether or not the person laying on the living room floor was in fact Appellant or what may have been wrong with the person on the floor. Additionally, the SRT did not know if there were others in the house or if the house was booby-trapped (TR 59). The police have a duty and obligation to secure the residence for their safety and the safety of anyone else who could be in the residence (TR 59)."
The parties in this case agree that the general rule is that police need a search warrant before they can search a person's home or seize contraband. They also agree that the state has the burden to show that an exception to the warrant requirement applied in this case. The dispute between the parties relates to whether or not the circumstances in this case fit into one of the recognized exceptions to the need for a warrant. Because appellee only argues that two exceptions apply in this case, (exigent or emergency circumstances and plain view) and because those are the two exceptions relied upon by the trial court in its ruling, we will focus our attention on the law relating to those exceptions.
In 1978 the Supreme Court of the United States said:
 "We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." Mincey v. Arizona
(1978), 437 U.S. 385, 392.
The Supreme Court further said: "And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." Id. at 393. The Supreme Court cautioned: "But a warrantless search must be `strictly circumscribed by the exigencies which justify its initiation,' * * *." Id. (quoting Terry v. Ohio (1968), 392 U.S. 1, 25-26). The Supreme Court went on to rule that a four-day search that began after all of the individuals in an apartment were located following a shooting of an undercover narcotics officer was not "justified by any emergency threatening life or limb." Mincey v.Arizona, 437 U.S. at 393.
In 1999 the Fifth District Court of Appeals noted that the Supreme Court ruling in Mincey v. Arizona established the rule that police can enter a residence without a warrant for an emergency. State v. Burgess (Nov. 4, 1999), Licking App. No. 99CA00035, unreported. The State v. Burgess court then discussed the recognized standard for reviewing a search and seizure that occurred following a warrantless entry of a residence for an emergency situation as follows:
 "In Ohio Arrest, Search and Seizure (1999 Ed.), Professor Lewis Katz discussed the scope of an emergency search at 185-286, Section 10.5 as follows: [']Exigent circumstances create justification for limited warrantless searches. The duration of the intrusion and the scope of the search are governed by the constitutional command of reasonableness, which will be evaluated in terms of the emergency. Once the emergency conditions have been alleviated, further intrusion must be sanctioned by a warrant. Any other interpretation of the emergency exception would create another general exception that would swallow the Fourth Amendment principle that warrantless intrusions are per se unreasonable. Furthermore, searches that extend beyond the scope of the actual emergency lead to an inference that the emergency is serving as a pretext to conduct a warrantless search.['] (Footnotes omitted.)" Id. (quoting Katz, Ohio Arrest, Search and Seizure (1999 Ed.) Section 10.5.)
 The Second District Court of Appeals of Ohio further expanded on how to evaluate the reasonableness of a search conducted without a warrant due to an emergency. City of Dayton v. Johnson (Feb. 5, 1999), Montgomery App. No. 17184, unreported. The court said: "Reasonable belief is assessed from the facts and circumstances known [to] the officers from their point of view." Id. The Second District Court of Appeals has also noted that: "A warrantless emergency entry cannot be used as a fishing expedition for evidence of a crime." State v. Cheadle (July 14, 2000), Miami App. No. 00CA03, unreported.
Applying these standards to the facts in this case, we agree with appellee and with the trial court that the police officers in this case reasonably believed there was an ongoing emergency (that appellant was armed and suicidal) when they entered his residence without a warrant. We therefore agree with the legal conclusion of the trial court that the officers' initial warrantless entry into appellant's home fit into the recognized emergency exception to the requirement for a warrant. However, we must further evaluate whether the duration and scope of the search were greater than was justified by the emergency.
The question of whether the police officers conducted a search that had a longer duration and greater scope than was justified by the emergency is crucial, because the state relies upon the emergency exception to a warrant requirement to justify the warrantless entry of appellant's residence, and then relies upon a second exception to the requirement for a warrant, the plain view doctrine, to justify the seizure of appellant's gun collection, including the two guns that led to charges being filed against him in this case. The Supreme Court of the United States has made it clear that three factors must exist before the plain view exception to the requirement for a warrant to seize evidence applies: (1) the officers must have a legal right to be in the area where they observed evidence in plain view; (2) the officers must have probable cause to associate the evidence with a crime (the incriminating character of the evidence is immediately apparent); and (3) the police must have a lawful right of access to the evidence itself. Horton v. California (1990),496 U.S. 128, 136-37. See, also, State v. Cooper (Sept. 26, 1997), Greene App. No. 97-CA-15, unreported.
After carefully considering the facts in this case, we conclude that appellee failed to meet its burden of showing that the scope and duration of the search conducted in this case were justified by the emergency situation encountered by the police. The evidence presented by appellee's own witnesses established that within two minutes, the reserve officer who was well acquainted with appellant and who could clearly identify appellant, had entered the residence and was stationed as a guard for appellant, who was lying handcuffed on the floor. Therefore, within two minutes the officers were aware that they had found and subdued appellant, the only person they reasonably believed had any need of their aid. Nevertheless, they continued to search throughout appellant's home for "possible victims or hostages" in accordance with their "protocol". Appellee conceded through stipulation that even if the officers knew right away that the person they subdued and handcuffed upon entry was appellant, they would have conducted a search of appellant's entire residence after he was found.
There was no testimony showing that the protocol followed by the SRT was tailored to the emergency situation that existed in this case, and we conclude that the use of "protocol" as a justification for the search is not sufficiently narrow to fit the strict limitations of warrantless emergency searches. The only emergency for which the officers had information, that appellant was in his home, was armed and was threatening to commit suicide, was alleviated when appellant was handcuffed and lying on the floor.
Under the facts in this case, therefore, the police had no legal right to enter appellant's basement. Since the police had no legal right to be in appellant's basement without a warrant, the first part of the three-part test for the application of the plain view doctrine is not met in this case. The trial court erred when it concluded as a matter of law that the scope of the search did not exceed legally acceptable boundaries and when it concluded that the plain view exception applied to the warrantless seizure of the contraband discovered by the police in appellant's basement. On that basis, appellant's sole assignment of error is found well-taken.
The judgment of the Erie County Court of Common Pleas is reversed. Pursuant to App.R. 12(B), we order appellant's conviction vacated and we order him discharged. Appellee is ordered to pay the court costs of this appeal.
 _______________________________ HANDWORK, J.
 Peter M. Handwork, J., James R. Sherck, J. CONCUR.
Richard W. Knepper, P.J. CONCURS IN JUDGMENT ONLY.