**Opinion issued August 30, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NOS. 01-11-00139-CR, 01-11-00140-CR

_____

## MIGUEL ANGEL NAVARRO, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

## On Appeal from the 240th Judicial District Court
## Fort Bend County, Texas
## Trial Court Case Nos. 10-DCR-05236A, 08-DCR-050238

---

## MEMORANDUM OPINION

After the juvenile court waived jurisdiction[1] and certified appellant, Miguel

Angel Navarro, to stand trial as an adult in criminal district court, a jury found

---

[1]    *See* TEX. FAM. CODE ANN. § 54.02 (Vernon Supp. 2011).

appellant guilty of the offenses of murder[2] and aggravated assault[3] and assessed his punishment at confinement for ninety-nine years.  In his first and second issues, appellant contends that the juvenile court erred in transferring the case to criminal district court and not holding a hearing on his motion to suppress evidence.  In his third, fourth, and fifth issues, appellant contends that the trial court erred in not suppressing certain evidence and instructing the jury.

We affirm.

## Background

After appellant, then fifteen years of age, was charged with the murder of Matthew Haltom[4] and the aggravated assaults of Joe Eodice[5] and Joel Arnold, the State filed a Petition for Discretionary Transfer in the juvenile court, requesting that it waive its jurisdiction and certify appellant to stand trial as an adult in criminal district court.

Before the transfer hearing, appellant moved to suppress certain statements that he had made to police officers.  The State argued that the juvenile court was

---

[2]    *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2011).

[3]    *See id.* § 22.02 (Vernon 2011).

[4]    Trial court cause number 10-DCR-05236A; appellate cause number 01-11-00139-CR.

[5]    Trial court cause number 08-DCR-050238; appellate cause number 01-11-00140-CR.

not required to consider the motion because a transfer hearing is "only a baseline finding as to whether or not [the juvenile court believes] that there is probable cause" that appellant committed the offense. The juvenile court agreed that appellant was not entitled to a hearing on his motion, and, at the conclusion of the transfer hearing, it granted the State's petition.

At trial, Mackenzie Haltom, Matthew Haltom's sister, testified that on December 26, 2007, her brother had a "bonfire" party at their parent's house. When she arrived at the house, she found 40 to 50 people standing around the bonfire in the back yard. Ten to fifteen more people, who Mackenzie and Matthew did not know, arrived approximately thirty minutes later. Matthew became upset, "swearing and yelling," and asked the new arrivals to leave several times. Although the new arrivals agreed to leave, they only relocated from the back yard to the front yard. When Matthew learned that they had not left the property, he walked to the front yard with a group including Arnold and Eodice. Matthew and his friends then argued with the new arrivals, demanding that they leave the property. The argument escalated until somebody threw a beer bottle at Matthew, after which the two groups started fighting.

During the fight, Mackenzie saw Eodice "in a fetal position" with two people attacking him. Later, after the fight had subsided, she saw Matthew, bleeding profusely, collapse onto the ground. While she was waiting for

emergency assistance, she noticed Eodice "laid down on the street" bleeding and Arnold "bent over holding his back." After paramedics arrived to take the three young men to a hospital, Mackenzie learned that Matthew had died of stab wounds.

Sarah Strelecki testified that on December 26, 2007, she was at her cousin's house when her cousin's boyfriend, Eric Hernandez, arrived in a car to pick them up. They met with a few friends, including Jeremy Cano, Victor Olivo, and Eric's cousin, Antonio Hernandez, who invited them to a party. Eric, following Cano's car, drove Strelecki and her cousin to the party, and they arrived at the Haltoms' house in a group of "eight or ten" people. Matthew approached Strelecki's friends and asked them to leave because there were "too many people" with them that he was unfamiliar with. Strelecki and her cousin retreated to Eric's car, but others in the group started "yelling vulgar things" and "screaming." The conflict escalated until "people started punching" each other. Eric returned to the car and attempted to drive away from the fight, but the street was "too crowded" for them to leave. In the car's headlights, she saw someone, later identified as appellant, holding a knife behind his back while "watching the fight" and "moving side to side." On cross-examination, Strelecki admitted that she had not seen appellant stab anyone.

4

Olivo, a friend of appellant's since they were in first grade together, testified that he rode to the Haltoms' house with Cano and Antonio. When they arrived at the party, Olivo saw appellant exit the back yard with a group of people who had just been asked to leave. During the fight, Olivo saw appellant on the ground "getting jumped." Appellant had a knife in his hand and "pull[ed]" someone down with him." Olivo later told a police officer that he had seen appellant stab a "white guy." After the fighting had subsided, Olivo got into Cano's car with appellant and several others. He noticed blood on appellant's sleeve and hands, and appellant stated that he had stabbed two people during the fight.

Cano, an acquaintance of appellant's, testified that he drove to the Haltoms' party with Olivo and Antonio. When the fighting started, Cano entered his car because he did not want to get involved, but his exit was blocked by the crowd. Before he could drive away, appellant entered the car. Cano noticed that appellant had blood on his clothing, and appellant stated that he had "stabbed" approximately "five people," including "two blacks." The group returned to Cano's house, where appellant produced his knife, which also had blood on it. Later, appellant claimed that he had stabbed only two people.

Giovanni Lopez, who had previously known appellant through his brother, testified that he was invited to the party, where he saw appellant standing by the bonfire in the back yard. During the fight, someone punched Lopez, and he fell

backwards into a ditch in front of the yard. Several people followed Lopez into the ditch, including an African-American male who had punched him. Appellant followed them into the ditch and told Lopez, "I got you," which, Lopez thought, meant that appellant had stabbed the African-American male. When leaving the Haltoms' house, Lopez got into the car with appellant, Cano, and Olivo. He saw that appellant had a knife in his hand and a blood stain on his own shoe.

The State then moved to introduce into evidence appellant's oral and written statements previously made to the police officers and a knife that had been retrieved from appellant's house. Appellant objected and moved to suppress both the statements and the knife, and the trial court held a hearing on his motion.

During the hearing on appellant's motion to suppress evidence, Fort Bend County Sheriff's Department ("FBCSD") Detective D. McKinnon testified that he was assigned to investigate the stabbings at the Haltoms' house. After Cano indicated that appellant might have information about the incident, McKinnon visited appellant's house to "try to make contact with him." He arrived at the house with three other police officers and knocked on the door, which "swung open" because it was ajar. A small child, later identified as appellant's five-year-old brother, stood in the middle of the living room, and, when McKinnon asked if any adults were home, the child responded, "No." McKinnon then "decided to enter the house to check the welfare of the child." He asked the child if appellant

6

was home, and the child pointed towards a bedroom door. McKinnon knocked on the bedroom door, and appellant answered, looking "like he had just woken up." Inside the bedroom, McKinnon saw a knife lying on appellant's bed. He asked appellant if he knew where his parents could be found, but appellant did not know. Several other police officers attempted to locate someone who could care for appellant's brother while McKinnon stayed at the house. As McKinnon waited for appellant's mother to return home, he asked appellant if he knew why police officers had come to the house, and appellant started to cry. McKinnon asked if he was involved in a fight at the Halstoms' house, and appellant admitted that "he might have stabbed a couple of people."

When appellant's mother, Maria Salazar, arrived at the house, McKinnon, through an interpreter, Detective M. Cox, asked Salazar for consent to search appellant's room because appellant had been "involved in an incident." Salazar orally consented to the search and signed a written consent form that authorized the police officers to search her "[h]ouse . . . [,] including appellant's bedroom," and to seize "any letter, the papers, the materials of any—that can be used against me in a criminal proceeding." The police officers then searched appellant's bedroom and seized the knife on appellant's bed, articles of clothing, and a small amount of marijuana. McKinnon later took recorded and written statements from appellant.

Salazar testified that on the morning of December 27, 2006, she went to work and left appellant to watch her younger son at home. She called appellant when she arrived at work, but "an officer took [the telephone] away from him" and told her that she "had to come home." When she arrived, the officers told her she could not enter the house, and she waited outside for approximately one hour. An officer handed her a piece of paper, which she signed, but she did not understand it very well. When she saw the officers, who had told her that they were "going to get a pair of pants" from appellant's bedroom, "moving things around" and "picking up everything," she asked them to stop because it became apparent that the officers were looking for more than clothing.

The trial court concluded that there was "nothing unlawful about the officers going into that home" and it was "entirely appropriate for the officers to inquire of a consent to search the home." Although it found that the written consent form signed by Salazar was "superfluous to the evidence," it further found that Salazar had "manifestly expressed that she had orally consented to the search of the home." The trial court also found that it was "inseparable that the clothing be seized but the knife not be seized" because the officers were "in a lawful position to observe the knife." The trial court then denied appellant's motion to suppress the knife, but it granted appellant's motion to suppress his oral and written statements.

After the trial court admitted the knife into evidence, Tonya Dean, a forensic scientist for the Texas Department of Public Safety, testified that DNA recovered from the handle of the knife was identified as that of appellant and "an unknown individual." Dean also found Matthew's and Eodice's DNA on blood stains on the knife.

The jury found appellant guilty of the murder of Halstom and the aggravated assault of Eodice, but it acquitted him of the aggravated assault of Arnold. The jury assessed his punishment at confinement for 99 years for the offense of murder and 20 years for the offense of aggravated assault, with the sentences to run concurrently.

## Juvenile Court Proceedings

In his first issue, appellant argues that the juvenile court erred in transferring the case to criminal district court because "there was no probable cause to support the charge of aggravated assault of [Arnold]" and there was "no evidence tying appellant to the stabbing." In his second issue, appellant argues that the juvenile court erred in not holding a hearing on appellant's motion to suppress evidence before the transfer hearing because it was required to do so.

### Probable Cause

An appellate court reviews a juvenile court's decision to waive jurisdiction and transfer a juvenile to the adult criminal justice system for an abuse of

discretion. *See Faisst v. State*, 105 S.W.3d 8, 12 (Tex. App.—Tyler 2003, no pet.); *see also State v. Lopez*, 196 S.W.3d 872, 874 (Tex. App.—Dallas 2006, pet. ref'd). A juvenile court may waive its exclusive original jurisdiction and transfer a juvenile to a criminal district court for criminal proceedings if (1) the child is alleged to have committed a felony; (2) the child meets one of two age requirements; and (3) after a full investigation and hearing, the juvenile court determines that probable cause exists to believe the juvenile committed the alleged offense and that the community's welfare requires criminal proceedings because of the serious nature of the offense or the child's background. *See* TEX. FAM. CODE ANN. § 54.02(a) (Vernon Supp. 2011).

The standard of review governing an appeal from a juvenile certification proceeding is generally the same as that in civil cases. *See* TEX. FAM. CODE ANN. § 56.01(b) (Vernon Supp. 2011); *In re T.D.*, 817 S.W.2d 771, 773 (Tex. App.—Houston [1st Dist.] 1991, writ denied). The juvenile court's findings of fact are reviewable by the same standards as are applied in reviewing the legal sufficiency of the evidence supporting a jury's answers to a charge. *In re G.F.O.*, 874 S.W.2d 729, 731–32 (Tex. App.—Houston [1st Dist.] 1994, no writ); *see also In re J.P.O.*, 904 S.W.2d 695, 700 (Tex. App.—Corpus Christi 1995, writ denied). When considering a "no evidence" point of error, we look only to the evidence favorable to the judgment to determine whether there is any evidence to support the finding.

10

*In re D.L.N.*, 930 S.W.2d 253, 255 (Tex. App.—Houston [14th Dist.] 1996, no writ).

Probable cause consists of sufficient facts and circumstances to warrant a prudent person to believe that the suspect committed the offense. *In re K.B.H.*, 913 S.W.2d 684, 689 (Tex. App.—Texarkana 1995, no writ); *In re D.W.L.*, 828 S.W.2d 520, 524 (Tex. App.—Houston [14th Dist.] 1992, no writ).

"If a petition alleges multiple offenses that constitute more than one criminal transaction, the juvenile court shall either retain or transfer all offenses relating to a single transaction." TEX. FAM. CODE ANN. § 54.02(g). "A child is not subject to criminal prosecution at any time for any offense arising out of a criminal transaction for which the juvenile court retains jurisdiction." *Id.* If the State's petition charges multiple offenses, the juvenile court must expressly dispose of each. *Richardson v. State*, 770 S.W.2d 797, 799 (Tex. Crim. App. 1989); *Mason v. State*, 778 S.W.2d 487, 488 (Tex. App.—Houston [14th Dist.] 1989, no pet.). It can transfer only those offenses which it finds probable cause to believe were committed, and it must dismiss the others. *See Turner v. State*, 796 S.W.2d 492, 494–95 (Tex. App.—Dallas 1990, no writ).

Appellant argues that because there is no evidence supporting the probable-cause determination on the offense of the aggravated assault of Arnold, the juvenile court erred in transferring the murder case and the case concerning the

11

aggravated assault of Eodice to the criminal district court. The record from the transfer hearing contains much of the same evidence that was presented at trial. Although appellant asserts that "[n]o witness said they saw appellant fight with or stab" Arnold, the record contains other evidence from which the juvenile court could have reasonably concluded that there was probable cause to believe that appellant stabbed Arnold. Mackenzie Haltom testified that Arnold "collapsed right in front of [her] mailbox" and he had been stabbed along with her brother and Eodice. Cano testified that he told a police officer that appellant, in the car after the fight, had said that he had stabbed "five people" including "two black kids." Although Lopez testified at the transfer hearing that he did not remember seeing appellant during the fight, the State played his recorded statement given to a police officer to the juvenile court. In the statement, Lopez noted that he was followed into a ditch by two African-American males, heard appellant say, "I got you," and saw appellant stab one of the African-American males. Of the three complainants, only Arnold was African-American, and he suffered stab wounds similar to those suffered by Matthew and Eodice. Viewing this evidence in a light favorable to the juvenile court's finding, it could have reasonably believed that appellant committed the aggravated assault of Arnold. Accordingly, we hold that the juvenile court did not err in finding that there was probable cause to believe that appellant committed the aggravated assault of Arnold.

12

We overrule appellant's first issue.

### Suppression Hearing

At a transfer and certification hearing, a juvenile court need only determine if there is "probable cause" that the juvenile committed the charged offense. *In re D.W.L.*, 828 S.W.2d 520, 524 (Tex. App.—Houston [14th Dist.] 1992, no writ). The transfer and certification hearing is a nonadversary preliminary hearing, in which the juvenile court may rely upon hearsay as well as written and oral testimony. *L.M.C. v. State*, 861 S.W.2d 541, 542 (Tex. App.—Houston [14th Dist.] 1993, no writ). A transfer hearing "does not require the fine resolution of conflicting evidence that an adjudication of guilt or innocence requires"; the hearing's only goal is to determine the proper forum in which to adjudicate the defendant's guilt or innocence. *Id.*

Numerous courts of appeals have held that juvenile courts are not required to consider the admissibility of statements at a transfer hearing. *See, e.g.*, *In re T.L.C.*, 948 S.W.2d 41, 44 (Tex. App.—Houston [14th Dist.] 1997, no writ); *L.M.C.*, 861 S.W.2d at 542; *In re M.E.C.*, 620 S.W.2d 684, 686–87 (Tex. Civ. App.—Dallas 1981, no writ); *In re Y.S.*, 602 S.W.2d 402, 404–05 (Tex. Civ. App.—Amarillo 1980, no writ). For example, in *L.M.C.*, a juvenile defendant argued that the juvenile court erred in admitting his confession at a transfer hearing. 861 S.W.2d at 541–42. The court noted that the juvenile court was

13

required to consider whether there was "evidence on which a grand jury may be expected to return an indictment," and a grand jury is not bound by the rules of evidence in making a probable cause determination. *Id.* at 542 (citing TEX. FAM. CODE ANN. § 54.02(f)(3) (Vernon 1986)). The court further noted that a juvenile defendant's constitutional rights would not be violated by considering the confession during a transfer hearing because:

> A transfer hearing does not require the fine resolution of conflicting evidence that an adjudication of guilt or innocence requires . . . . Moreover, appellant's rights will be fully protected when the case reaches trial, whether it ultimately takes place before the juvenile court or the criminal district court.

*Id.*

In support of his argument that the juvenile court erred in not holding a hearing on his motion to suppress evidence, appellant relies on two cases from the San Antonio Court of Appeals. *See In re S.A.R.*, 931 S.W.2d 585 (Tex. App.—San Antonio 1996, writ denied); *R.E.M. v. State*, 541 S.W.2d 841 (Tex. App.—San Antonio 1976, writ ref'd n.re.). In *S.A.R.*, the juvenile defendant argued that his statements were inadmissible at the transfer hearing because they were obtained in violation of section 51.09(b) of the Texas Family Code, which provides that "the statement of a child is admissible in evidence in any future proceeding concerning the matter about which the statement was given if" the child is read his legal rights and told the consequences and sentencing possibilities of admitting to various

14

crimes. 931 S.W.2d at 587 (citing TEX. FAM. CODE ANN. § 51.09(b) (Vernon Supp. 1996)). The State argued that it was unnecessary to consider the admissibility of the statements because "a waiver and certification hearing" is "not adjudicatory in nature." *Id.* The court held that the plain language of section 51.09(b), which refers to "any future proceeding," requires the juvenile court to consider the admissibility of the juvenile defendant's statements at the transfer hearing. *Id.*

The court in *S.A.R.* relied in part on *R.E.M.*, in which the juvenile defendant argued that the juvenile court improperly relied on witness testimony from a previous transfer hearing in waiving its jurisdiction. *R.E.M.*, 541 S.W.2d at 845. The juvenile defendant relied on the evidentiary rule that "the testimony of a witness given at a prior trial of the same case" may only be introduced into evidence if the witness is otherwise unable to testify. *Id.* (citing *Houston Fire & Cas. Ins. Co. v. Brittian*, 402 S.W.2d 509, 510 (Tex. 1966)). The court held that there is "no reason why the rule should not be applied in a hearing for the purpose of determining whether a youthful offender is going to be deprived of the protection afforded by the juvenile court system." *Id.* The court concluded that the juvenile court erred in relying on the prior witness testimony, and it remanded the case to juvenile court. *Id.* at 847.

15

Appellant notes that the Juvenile Justice Code was amended to delete the provision that the juvenile court, during a transfer hearing, "shall consider, among other matters . . . whether there is evidence on which a grand jury may be expected to return an indictment." Act of May 27, 1995, 74th Leg., R.S., ch. 262, § 106(a), 1995 Tex. Gen. Laws 2517, 2591. However, as noted in *L.M.C.*, the consideration of grand-jury evidence was only one justification for not requiring juvenile courts to rule on the admissibility of evidence during a transfer hearing. 861 S.W.2d at 541–42. The Texas Family Code still only requires a juvenile court to determine whether there is probable cause that the juvenile committed the alleged offense. TEX. FAM. CODE ANN. § 54.02(a)(3). Thus, a transfer hearing remains a "nonadversarial preliminary hearing" and "appellant's rights will be fully protected when the case reaches trial." *L.M.C.*, 861 S.W.2d at 542; *see also State v. Lopez*, 196 S.W.3d 872, 874 (Tex. App.—Dallas 2006, pet. ref'd) (holding juvenile defendant was not entitled to jury trial at transfer hearing because, during such hearing, juvenile court "is not required to conform to all of the requirements of a criminal trial or even of the usual administrative hearing" and transfer hearing "is comparable to a criminal probable cause hearing and the court need not resolve evidentiary conflicts beyond a reasonable doubt"). Accordingly, we opt to agree with our sister court in *L.M.C.* and hold that the juvenile court was not required to resolve the admissibility of appellant's statements before the transfer hearing.

16

We overrule appellant's second issue.

## Motion to Suppress

In his third issue, appellant argues that the trial court erred in denying his motion to suppress the knife recovered from his bedroom because the State failed to prove that Salazar, his mother, consented to the search of the bedroom and the initial entry of the police officers was not justified under the community-caretaking doctrine.

We review a ruling on a motion to suppress evidence for an abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We generally consider only the evidence adduced at the suppression hearing unless the parties consensually re-litigate the issue at trial, in which case we also consider relevant trial testimony. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and we review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). At a suppression hearing, a trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Accordingly, a trial court may choose

to believe or to disbelieve all or any part of a witnesses' testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

When the trial court makes findings of fact with its ruling on a motion to suppress, an appellate court does not engage in its own factual review but determines only whether the record supports the trial court's fact findings. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). Unless a trial court abuses its discretion in making a finding not supported by the record, we will defer to the trial court's fact findings and not disturb the findings on appeal. *Cantu v. State*, 817 S.W.2d 74, 77 (Tex. Crim. App. 1991).

### *Initial Entry*

In regard to the police officers' initial entry into the Salazar home, the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within a place is in need of immediate aid. *Laney v. State*, 117 S.W.3d 854, 858 (Tex. Crim. App. 2003) (citing *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 2413 (1978)). The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. *Id.* Such a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." *Id.*

For example, in *Laney*, police officers responded to a call at the defendant's mobile home and eventually arrested the defendant. *Id.* at 856. After they placed the defendant in their patrol car, the officers noticed "two young boys" alone in the mobile home. *Id.* An officer testified that because he had detained the defendant, "it was his responsibility to get the children out of the trailer and find out who their parents were." *Id.* He then entered the mobile home to locate the children and, while doing so, found and seized photographs depicting child pornography. *Id.* The Texas Court of Criminal Appeals held that the officer lawfully entered the mobile home to ensure the safety of the children, noting that "[a]rguably, the deputies would have been criminally liable" for abandoning the children. *Id.* at 862–63. The court concluded that both the initial entry into the home and the seizure of evidence in plain view were lawful. *Id.* at 863.

Likewise, here, Detective McKinnon testified that upon arrival at the Salazar home, he found the front door ajar. When he knocked on the door, it swung open, and he saw appellant's five-year-old brother standing alone in the living room. When McKinnon asked him if there were any adults in the house, the child responded, "No." McKinnon then entered the home in order to "check on the welfare of the child." A second police officer testified that when the officers knocked on the door, the child answered the door, appeared to understand

their questions, and responded that no adults were home. McKinnon then asked the child if appellant was at home, and the child pointed toward appellant's bedroom door. When McKinnon knocked on the door, appellant opened the door, and McKinnon saw the knife lying on appellant's bed in plain view. Although appellant asserts that the officers could not lawfully remain in Salazar's home after taking the child to a neighbor's house, we note that McKinnon testified that the officers committed no further search of the home and merely waited for Salazar to arrive so that they could obtain her consent to search. Accordingly, we cannot conclude that the trial court abused its discretion in finding that the officers lawfully made their initial entry into the home.

### *Consent*

Appellant further argues that the trial court erred in admitting the knife into evidence because Salazar's consent was "not shown to be voluntary by clear and convincing evidence" and the police officers' search of appellant's bedroom exceeded the scope of any consent that she gave.

The State must prove by clear and convincing evidence that any consent to search was voluntary. *State v. Ibarra*, 953 S.W.2d 242, 243 (Tex. Crim. App. 1997); *Vasquez v. State*, 324 S.W.3d 912, 922 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). We consider the totality of the circumstances to assess whether

a consent to search was voluntary. *Reasor v. State*, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000).

Appellant asserts that "[m]any factors refute the court's conclusion that the mother gave voluntary consent," including the presence of "[m]ultiple armed officers," Salazar's "not [being] allowed in the house for an hour" after her arrival, her not "understand[ing] the written consent form," and the facts that Salazar has only a "first grade education" and "speaks no English." However, there was conflicting testimony regarding many of these factors.

For example, Detective McKinnon testified that after locating appellant, all of the officers left the home besides himself, who waited with appellant, and Detective Cox, who acted as an interpreter. He noted that when Salazar returned to the house, she spoke with him and Cox. Regarding her understanding of the written consent form, we note that the trial court specifically did not rely on it in making its determination that she consented to the search. Also, Cox testified that Salazar did not have any difficulty communicating with her in Spanish.

Regarding the scope of the search, although Salazar testified that she believed that the officers entered appellant's bedroom only to search for clothing, McKinnon testified that he actually asked for oral and written consent to search the bedroom. The trial court specifically noted that Salazar did not object to the seizure of the knife found on appellant's bed or the marijuana found underneath

21

appellant's mattress as evidence that Salazar understood the search to be a search of appellant's bedroom, and not merely for clothing. Instead, Salazar did not object until McKinnon found a paper bag containing "multiple ID cards" and asked her about them.

Viewing this evidence in the light most favorable to the trial court's ruling, we conclude that the trial court could have formed a firm belief or conviction that Salazar orally and voluntarily consented to the search of appellant's bedroom. Accordingly, we hold that the trial court did not err in admitting into evidence the knife found in appellant's bedroom.

We overrule appellant's third issue.

**Jury Charge**

In his fourth and fifth issues, appellant argues that the trial court erred in not instructing the jury regarding the right to self-defense against multiple assailants and the right to defend a third party against multiple assailants because "the evidence is clear that [he] and his brother were both threatened by multiple assailants."

In analyzing a jury charge issue, our first duty is to decide whether error exists. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). If we find error, we then analyze that error for harm. *Id.* The degree of harm necessary for reversal depends on whether the defendant preserved the error by objection.

*Id.* Reversal is required for a jury charge error when the defendant has properly objected to the charge and we find "some harm" to his rights. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). When the defendant fails to object or states that he has no objection to the charge, we will not reverse for jury-charge error unless the record shows "egregious harm" to the defendant. *Bluitt v. State*, 137 S.W.3d 51, 53 (Tex. Crim. App. 2004); *Almanza*, 686 S.W.2d at 171. Thus, we review alleged charge error by considering: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal. *See Posey v. State*, 966 S.W.2d 57, 60 & n.5 (Tex. Crim. App. 1998).

A trial court errs in not submitting a defensive instruction to the jury only if the record indicates that the trial court understood the request "to encompass the matters" raised on appeal. *Bennett v. State*, 235 S.W.3d 241, 243 & n.9 (Tex. Crim. App. 2007); *Jackson v. State*, 288 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). A trial court has no duty to instruct the jury on unrequested defensive issues, even when those issues are raised by the evidence. *Posey*, 966 S.W.2d at 62; *Jackson*, 288 S.W.3d at 63. Defensive instructions must be requested in order to be considered applicable law of the case requiring submission to the jury. *Bennett*, 235 S.W.3d at 242. Thus, generally no error exists in the charge when a defensive issue was not requested or otherwise brought to the court's attention. *Posey*, 966 S.W.2d at 61–62.

Here, at the charge conference, appellant's counsel stated that he had "no objection" to the trial court's charge, and there is nothing in the record to indicate that appellant proffered a jury charge containing an instruction for self-defense against multiple assailants or the right to defend a third party against multiple assailants. Appellant now asserts that "trial counsel recently advised appellate counsel that she <u>did</u> object to the lack of multiple assailants charges" in a "charge conference held off the record" and he will "seek to perfect an agreed amendment to the record on this issue, or, alternatively, an out-of-time formal bill of exception." However, appellant has not submitted an agreed amendment or a bill of exception to this Court.

Accordingly, because there is nothing in the record indicating that appellant requested a jury charge on multiple assailants, we hold that no error exists in the trial court's charge to the jury. *See Bennett*, 235 S.W.3d at 243 & n.9 (finding no error in charge because defendant's complaint was insufficient to convey issue presented on appeal); *Jackson*, 288 S.W.3d at 63 (holding that trial court did not err in omitting unrequested instruction sought for first time on appeal).

We overrule appellant's fourth and fifth issues.

## Conclusion

We affirm the judgments of the trial court.


Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Do not publish. TEX. R. APP. P. 47.2(b).