[Cite as *State v. Hallam*, 2012-Ohio-5793.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

STATE OF OHIO                    :

    Plaintiff-Appellee          :          C.A. CASE NO.    2012 CA 19

v.                               :          T.C. NO.    11CR333

BRYAN HALLAM                     :          (Criminal appeal from
                                        Common Pleas Court)

    Defendant-Appellant        :

                                        :

. . . . . . . . . .

# **O P I N I O N**

Rendered on the ___7th___ day of ___December___, 2012.

. . . . . . . . . .

LISA M. FANNIN, Atty. Reg. No. 0082337, Assistant Prosecuting Attorney, 50 E. Columbia Street, 4th Floor, P. O. Box 1608, Springfield, Ohio 45501
      Attorney for Plaintiff-Appellee

RICHARD E. MAYHALL, Atty. Reg. No. 0030017, 20 S. Limestone Street, Suite 120, Springfield, Ohio 45502
      Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**   This matter is before the Court on the Notice of Appeal of Bryan Hallam,

filed

March 26, 2012. Hallam appeals from his conviction and sentence, on one count of illegal cultivation of marijuana, in violation of R.C. 2925.04, a felony of the fifth degree, following a no contest plea, which Hallam entered after the trial court overruled his motion to suppress. Hallam was sentenced to one year of community control sanctions. We hereby affirm the judgment of the trial court.

{¶ 2} At the suppression hearing, Deputy Dustin Hensely, of the Clark County Sheriff's Office, testified that on November 28, 2010, he responded to 3787 Miller Road "to conduct a welfare check at the request of Deputy Ronny Lemen" regarding "some small juveniles supposedly staying at the residence." According to Hensley, Lemen advised him "that the gentleman he was talking to, I believe it was the ex-husband of Miss Bolin and the father of the children that I was being sent to check the location for, wanted us to conduct a welfare check just because to make sure that the children were okay. And Miss Bolin was okay. For whatever reason, he hadn't heard from them." Hensely stated that the residence "was quite a distance from the road."

{¶ 3} Hensley testified as follows:

* * * when I pulled up to the residence, there were several vehicles in the driveway. The house was dark. I couldn't tell for sure whether anybody was home. The garage doors were up though, so I went inside the garage is my first area that I noticed when I pulled into the driveway (sic). Went inside the garage and then attempted to knock on the interior garage door to try and raise somebody inside the house. Wasn't able to get any answer there.

So I proceeded to walk around the house to the front of the house, and

that's when I noticed the front door. So I went to approach the front door, and I noticed that the front door appeared to have been left open or was slightly ajar. I knocked on the door again and announced myself inside the residence, "Sheriff's department, anybody home? Sheriff's department." And yet again, I didn't get any response.

While I was checking the outside front of the residence, I noticed a broken glass pane window. I also looked inside the windows and stuff like that into the interior of the residence. I noticed that the house inside appeared to be in total disarray. There were clothes, furniture, other kind of furniture, blankets, and whatnot just scattered all around the front living room area of the house; and the house appeared to me to be ransacked.

He stated that the broken window he observed was "on the side of the garage," and that the condition of the window indicated to him "somebody could have forced entry * * * into the garage. I couldn't tell at that time. It was dark and whatnot, but I couldn't tell whether it was old or new damage. * * * ." Hensley stated that he did not further inspect the window.

{¶ 4}     Regarding the front door, Hensley testified as follows:

Appeared like it had been closed, but it wasn't closed all the way. Like when I went to knock, it had opened up even further; and so then I checked the door handle to see if the door was even locked at any point in time. The door was unlocked itself because when I was jiggling the outside of the handle, the latch would move in and out, indicating that it had not even been locked.

{¶ 5} Hensley further testified, based upon the requested welfare check, the condition of the home's interior, and the unlocked and ajar front door, "At that point in time I wasn't sure what exactly was going on here. I knew that, you know, I needed to find out whether or not there was anybody that required any kind of emergency attention inside the residence." Hensley stated that he entered the front door, and noticed that there "was a high level, kind of like an overlook balcony overlooking my current position," as well as a hallway leading to the rest of the home. Out of concern for his safety, Hensley stated that he decided to check the upstairs area first. Hensley stated that he proceeded upstairs, where he observed a small office, a bedroom and a bathroom.

{¶ 6} After determining that no one was upstairs, Hensley returned to the first floor and proceeded down the hallway while announcing his presence. Hensley stated that he opened the first door he reached in the hallway, which "led downstairs to a basement." As he began to descend the stairs, Hensley sensed "like really moisture-filled air and also I smelled the odor of marijuana." Once downstairs, Hensley observed sliding doors that were covered with a blanket "so nobody could see inside from outside the residence." Hensley stated that there were "items all over the area, including some furniture and whatnot." Hensley testified that he also observed "construction grade plastic" that was "draped from the ceiling of the basement all the way down [to] the floor and it was like boxing in a certain corner of the room." Hensley stated that he believed the area was a "makeshift bedroom," and he heard a fan and observed that the area was lit. While announcing his presence without response, Hensley stated that he approached the area, where he located several plants that appeared to be marijuana, along with heat lamps and fan blowing on the plants. Hensely stated that, upon this discovery, he "backed out of the residence and called for

backup," due to "the seriousness of the situation that I was in and, not knowing whether or not for sure anybody was waiting in ambush for me in the house."

{¶ 7} On cross-examination, Hensley stated that he approached the house at 7:40 p.m. Hensley stated that he did not attempt to open the interior garage door but rather proceeded to the front of the house, where he observed the broken window on his way to the front door. He remembered "walking around the back of the house and also walking around the bottom side where I saw the sliding doors; and I tried to shine my flashlight inside and, obviously, I couldn't because" of the blanket. Hensely stated that he did not approach the back of the house from the outside until additional units responded to the scene. When asked through which window he initially viewed the disarray inside the home, he responded, "It was one of the front house windows." When defense counsel advised Hensley that all of the windows on the front of the home are garage windows, Hensley stated, "It might have been even through the - - through the front door. I can't remember exactly."

{¶ 8} Hensley identified a photograph of the front door of the home and acknowledged that the narrow windows on either side of the door do not contain "clear glass." While he was unable to "distinctly" see through these windows, Hensley stated that he was "pretty sure I was able to shine my flashlight through the window there as well as the cracked door; and it was ajar. As I knocked on it, I could open it up even more. So I was able to see inside the residence at that point." Hensley acknowledged that in his written report, he did not indicate that the residence was in disarray prior to his entry therein. In response to a question from defense counsel, Hensley acknowledged that his report provides that he smelled marijuana as soon as he entered the house but could not determine where the

odor originated.

{¶ 9}  Hensley stated that he passed through large iron gates at the base of the driveway, which were open, as he approached the residence.  He stated that he did not observe "lights being turned on or off" in the residence as he approached.  Except for the fan, Hensley stated that he did not hear any sounds within the residence.  Hensley acknowledged that his written report indicates that "Deputy Lemen contacted you and asked if you could go to this residence and have Miss Bolin contact him in regards to the civil custody dispute."  The following exchange occurred:

Q. * * * Now, you received no information the children involved in this civil dispute, or anybody else for that matter at that residence, was in any kind of distress or any kind of danger.

A.  At that point in time I had not received any information, but I at the same time knew that nobody had been able to contact them.

Q.  For what period of time?

A.  I don't know.

Q.  Again, no indication, no information that anybody was in trouble.

A.  Correct.

Q.  Was there any other reason for you to be dispatched to 3787 Miller Road that evening?

A.  No sir, not that I can recall.

Q.  There were no reports of burglar alarms having gone off?

A.  Alarms?  No sir.

Q. No reports from neighbors or from anyone else that there were intruders in the premises?

A. No sir, the house was pretty secluded. It * * * sat quite a ways off the roadway. So at that point I had no idea what was going on in the residence once I found the initial items that were out of order.

Q. * * * So you had received no reports from anybody that there was a problem at this residence.

A. Correct, other than the welfare check.

{¶ 10} Hensley identified a photograph of the broken window he observed at the residence. When asked if there was another pane of unbroken glass behind the broken pane, Hensley stated that he did not know. Hensley stated that he "didn't know if it would have been something where somebody could have reached in and unlocked any additional windows or anything like that. I just initially saw the window was broken, looked out of order, and that's when, you know, it concerned me." Hensley stated that he did not see any broken glass inside the garage. When asked why he did not further investigate the condition of the window, he stated, " * * * my initial, you know, thinking pattern when I was at this location was I need to try to make contact with somebody at this residence. That's why I approached the front door. Like I said, I didn't know if it was old or new. I didn't know if there was still somebody inside the residence or what kind of situation I was in, especially being there by myself." Hensely stated he "wasn't concerned at the time because [the window] was leading into the garage. There didn't appear to be anything missing or out of order that I could tell in the garage. So initially my first step was to try to make contact

with somebody." Hensley stated that he did not know if the garage doors had been opened from the inside.

{¶ 11} Regarding the front door, Hensley stated that it was a quarter inch ajar, "like it hadn't been pulled closed all the way." Hensely stated that he looked for signs of forced entry but observed none. The following exchange occurred:

Q. Now, the search warrant said that you entered the residence - - and I understand that you didn't make this search warrant affidavit; but it said that you entered the residence in an attempt to sweep for possible victims for intruders (sic).

A. Yes, sir.

Q. * * * That's a true statement?

A. Yes, sir.

Q. Would you tell me every fact, every circumstance that you observed out there that led you to conclude that there was a fair probability that there was an intruder or possible victim in that residence?

A. The fact that the door was ajar, the front door was ajar, the garage doors were opened. There was no answer when I called inside the residence. It was a very large residence, as well as the broken glass that I observed at that point in time, which later I noticed that it appeared that it had been like that; but, you know while I was there, as well as when I saw the door open and looked inside the house, the house was in disarray. It didn't appear that, you know, to me it was pretty unkempt. So I wasn't sure

whether or not anybody had been inside the house, ransacked it, or looking for something or if somebody - - or if there was a struggle at that point in time.

Hensley acknowledged that in his written report, he "indicated that the house appeared to be a renovation or construction site," and that he later learned that was in fact true.

{¶ 12} Hallam testified that he owns the residence at issue. He denied that his front door could remain ajar, as Hensly testified, "[b]ecause we have heat inside the house, and when that door opens automatically, you cannot hold the door at a crack. You can't try to hold it shut. If the door handle is open at all, the door swings all the way open and faces the fireplace because the heat in the house sucks the door open and the cool air in." Hallam stated that he attempted to recreate the scenario Hensley described with his door, and "there's no way to hold the door in that position." He also stated that he owns "five puppy dogs" who "would have been inside that house if the door was open." Hallam testified that his dogs were outside when he returned home on the evening in question.

{¶ 13} Hallam identified a photograph of his garage window. He testified that it is a triple pane window, and that "a brick had been tossed into it about six years ago from the lawn mower." He stated that he had not replaced the window because "the back panes are not broke so it still keeps the cold air out of the garage." Hallam stated that the hole in the glass at its widest part is eight inches. When asked if the hole was large enough for someone to gain entry to the garage thereby, Hallam replied, "No, not at that elevation that the hole is."

{¶ 14} At the conclusion of closing arguments by counsel, the following exchange

occurred:

THE COURT: What he had when he went out there, as I understand it, was another deputy telling him that he had gotten a call from a custodial parent saying that they had not returned * * * the children in time and he can't reach them on the phone. Is that correct?

MR. DRISCOLL: That's my understanding, yes.

THE COURT: But there was no, nothing saying that the person - - the custodial parent knew that they were at that house, was there?

MR. DRISCOLL: Well, that I believe that's where they were supposed to be.

THE COURT: No, they were supposed to be returned to the custodial parent. Did he have any way of knowing or any information that they were at that house that day?

MR. DRISCOLLL: I believe that's why they were sent to the house because - -

THE COURT: Because someone made the assumption that they would be at home.

* * *

THE COURT: * * * But it still would have been dark or fairly dark at 7:30, a broken window, not all three panes broken; and I know we've got testimony that the door will not stay closed with only a quarter-inch crack between the door and the frame. That would assume all of the barometric

pressures and all other pressures at the time were the same as the time of the test; but if it was slightly ajar and upon knocking, it opened a little bit further allowing to see disarray in the house and the garage door open, and considering the location of the house, the options the deputy had was to check closer to see if there was a problem or to walk away, he walks away and somebody's inside injured, then the argument would be that he didn't follow the obvious clues.

Having followed clues which, in retrospect, do not seem all that great; but at the same time when it became possibility (sic) of a problem, the Court finds no fault with what the deputy did.

{¶ 15} In its Decision overruling Hallam's motion, the court, in "considering the totality of the circumstances," found that "exigent circumstances existed justifying the warrantless entry into defendant's home. Once in the home and during a walk through in an attempt to determine if there was someone in need of emergency assistance, the evidence regarding the cultivation of marijuana came into plain sight."

{¶ 16} Hallam asserts one assignment of error as follows:

"THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN OVERRULING HALLAM'S MOTION TO SUPPRESS."

{¶ 17} Hallam directs our attention to several facts adduced in Hensley's testimony, namely that Hensley observed no signs of forced entry at the residence, he had received no information that anyone in the the house was in distress or trouble, or even inside the home, and there were no reports of an activated burglar alarm. Hallam asserts that one broken

pane of glass in a triple pane window does not support an inference of forced entry, and he argues that Hensely "testified, essentially, that he did not think the broken pane was any indication that an exigent circumstance or emergency existed." Hallam also asserts that Hensley "conceded that, in his written report, he never mentioned seeing disarray in the house until he had made his entry." Finally, Hallam directs our attention to his testimony that his front door, if ajar as Hensely testified, "would have blown wide open."

{¶ 18} As this Court has previously noted:

"Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted) . At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence." *State v. Hurt*, Montgomery App. No. 21009, 2006-Ohio-990.

*State v. Purser*, 2d Dist. Greene No. 2006 CA 14, 2007-Ohio-192, ¶ 11.

{¶ 19} The Fourth Amendment to the Untied States Constitution, which is

applicable to the states through the Fourteenth Amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to  be searched, and the persons and things to be seized."  Violations of the Fourth Amendment require courts to apply the exclusionary rule, suppressing use of any evidence that was illegally obtained.  *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

{¶ 20}    As this court has further previously indicated:

The Fourth Amendment to the United States Constitution protects people from "unreasonable" searches and seizures.  Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject to only a few well recognized exceptions.  *Katz* v. *United States* (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576.  One such recognized exception is the exigent circumstances or "emergency" exception.  Pursuant to that rule, a police officer, even absent a warrant or probable cause, may lawfully enter a structure, including a private home, when the totality of the facts and circumstances known to the officer gives rise to a reasonable belief that immediate entry is necessary to either protect that property or assist people inside who may be in danger or in need of immediate aid.  Ringel, Searches, Seizures, Arrests and Confessions, Section 10.5(a); Katz, Ohio Arrest, Search and Seizure, Section 10.01-10.03.

A myriad of factual circumstances may give rise to an emergency

situation and the corresponding need for an immediate warrantless entry. * * * When police reasonably believe that a burglary is in progress or has occurred at a particular structure, an immediate warrantless entry undertaken to investigate and protect that property and assist any victims inside who may be in danger or in need of immediate aid has been upheld by the courts as a reasonable search. See Lafave, Search and Seizure, Section 6.6(a) and (b).

The concept of emergency circumstances justifying an immediate warrantless entry by police has long been recognized in Ohio. *State v. Hyde* (1971), 26 Ohio App.2d 32, 268 N.E.2d 820; *State v. Roach* (1982), 8 Ohio App.3d 42, 455 N.E.2d 1328; *State v. Morris* (November 29, 1989), Montgomery App. No. 10992, unreported. However, the warrantless entry and search must be limited in duration and scope to the purpose justifying that intrusion, including only that which is necessary to alleviate the emergency and the dangers associated therewith. *Mincey v. Arizona* (1978), 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290. During a warrantless emergency entry police may seize contraband which is in plain view. * * *.

*State v. Overholser*, 2d Dist. Clark No. 96-CA-0073, 1997 WL 451473 (July 25, 1997).

**{¶ 21}** As this Court noted in *Overholser,* quoting *Morris*:

Every Fourth Amendment question turns on the issue of reasonableness, and every determination of reasonableness is *sui generis*. When in an investigation of crime a search and seizure is impelled by reasons of genuine physical danger to any person, it presents concerns and needs that

are not easily served by a slow, deliberative process. Actions are to be judged on a common sense standard[.]

{¶ 22}    At issue herein  is whether Hensley, at the time he entered Hallam's home, based upon the totality of the circumstances, had a reasonable belief that a burglary was in progress or had just occurred, or that there might be someone inside the home who was in danger or in need of prompt aid.  We agree with the trial court that exigent circumstances existed justifying Hensley's warrantless entry into the residence, based upon  the sequential events leading up to the entry.   We first note that Hensley was dispatched to the residence based upon an express concern for the welfare of small children and their mother.  Upon arrival at the dark and remote location, Hensley, who was alone, discovered "several vehicles," the presence of which would suggest that people might be present at the premises.  At 7:40 p.m. it is reasonable to expect any occupants of the home to be up and about, although no lights were visible inside the residence.  The garage door stood open, and when Hensley went inside the garage and knocked on the door to the home and announced his presence, there was no response.  The fact that he got no response after having been dispatched on a welfare check was legitimate cause for concern.  As Hensley approached the front of the house, he noticed a broken garage window, which initially indicated to him that "somebody could have forced entry * * * into the garage," and he did not know if the garage had been opened from within. We note that to the extent Hallam asserts that Hensley testified that the broken pane did not indicate to him the existence of any exigency, Hallam mischaracterizes Hensley's testimony.  In the darkness Hensely was unable to discern whether the broken window "was old or new damage," and since nothing seemed out of

order in the garage, he continued directly to the front door with elevated concern to locate any occupants. Hensley noted that the front door was ajar and the home was accordingly not secure. When Hensley knocked and announced his presence, again without response, the door opened further and Hensley observed that the home was in disarray. The interior condition of the residence suggested to Hensley the possibility that someone had ransacked the home in search of something, or engaged in a struggle therein, consistent with a crime scene, and Hensley entered the residence. Applying common sense to the facts herein, although a close call, we conclude that Hensley's entry into Hallam's residence was reasonable and lawful, and the contraband he located was in plain view and subject to seizure.

{¶ 23} There being no merit to Hallam's assigned error, it is overruled. The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and FROELICH, J., concur.

Copies mailed to:

Lisa M. Fannin
Richard E. Mayhall
Hon. Richard J. O'Neill